# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
January 7, 2014

Lyle W. Cayce
Clerk

No. 11-20791

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

UMAWA OKE IMO; CHRISTINA JOY CLARDY; KENNETH IBEZIM
ANOKAM,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and DeMOSS and CLEMENT, Circuit Judges.

CARL E. STEWART, Chief Judge:

This appeal arises from the conviction of Defendants-Appellants Umawa Oke Imo, Christina Joy Clardy, and Kenneth Ibezim Anokam for their involvement in a health care fraud scheme. Defendants-Appellants challenge the district court's refusal to give a requested limiting instruction during trial and the final jury charge. Clardy contends that there is insufficient evidence to support her conviction for health care fraud, conspiracy to commit health care fraud, and mail fraud. Clardy also raises three evidentiary challenges. In addition, Clardy and Anokam challenge the district court's application of a sentencing enhancement based on their intended loss, and Anokam argues

No. 11-20791

that the district court erroneously imposed a sentencing enhancement for mass marketing.[1]  We AFFIRM Defendants-Appellants' convictions and sentences.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

### A. Factual Background

#### 1. City Nursing Services of Texas ("CNS")

Imo owned CNS, an alleged physical therapy clinic in Houston, Texas. In May 2006, he submitted an application to Medicare on behalf of CNS; both Imo and Clardy signed the certification statement on the application as the administrator and medical director, respectively.  Additionally, they signed the Medicare participating physician or supplier agreement, which ensured that payments for any filed claims would go to CNS rather than the patient.

Subsequently, Medicare approved CNS's application and provided it with a billing number.  Medicare also sent CNS a confirmation letter, indicating that Clardy was approved and providing an individual number for billing.  Claims could therefore be billed under Clardy's number beginning on July 19, 2006.  In addition, Imo submitted an application to Medicaid for CNS, identifying Imo as the owner and Clardy as the doctor.  CNS was approved and given the information needed to begin filing claims with Medicaid.  From approximately March 2, 2006 to June 26, 2009, CNS billed Medicare and Medicaid for approximately $30 million.  However, CNS was never registered

---

[1] Although Imo and Clardy reserved the right to adopt the arguments raised by the other Defendants-Appellants, they have not done so.  However, Anokam sought to adopt the arguments raised by Imo and Clardy.  The only argument raised by another Defendant-Appellant but not Anokam is Clardy's sufficiency of the evidence challenge.  Because that argument is fact-specific, Anokam may not adopt that argument, and we therefore do not consider it.  *See United States v. Stephens*, 571 F.3d 401, 404 n.2 (5th Cir. 2009). ("[S]ufficiency of the evidence challenges are fact-specific, so we will not allow the appellants to adopt those arguments." (internal quotation marks and citation omitted)).

[2] We limit our discussion of the facts in this section to a general overview.  Additional facts are provided when necessary throughout this opinion.

to provide physical therapy services and did not have any licensed physical therapists.

Clardy, an anesthesiologist, worked at CNS along with her twin sister, Dr. Catherina Clardy ("Dr. Catherina"). Clardy contracted with CNS to work fifteen hours a week in return for a monthly salary of $5,000;[3] this contract was also submitted in CNS's application to Medicare. According to her contract with CNS, Clardy's duties included supervising the physical therapy services provided and maintaining the medical records associated with those. In fact, Clardy sent CNS a letter stating that physical therapy and occupational therapy services could only be billed to Medicare when she directly supervised the therapy and the services were pursuant to a treatment plan she established. Clardy, however, was not licensed to provide physical therapy services. A report by Health Integrity, a government contractor responsible for investigating, *inter alia*, fraud for Medicare and Medicaid, demonstrated that claims submitted under Clardy's billing number were primarily for physical therapy services. Indeed, based on the submitted bills, Clardy supposedly supervised more than 380 patients during the course of a single day; each patient purportedly received three hours of physical therapy.

### 2. Overview of the Scheme

Beginning in November 2006, Imo brought patients to CNS to be treated by Latricia Smith, a physical therapy aide. CNS only accepted patients with Medicare or Medicaid. Once CNS began to expand, additional employees were hired to recruit patients to CNS. CNS paid these employees for each patient they brought to the clinic. CNS also paid patients whenever they visited the

---

[3] Clardy testified that she signed another contract with Imo in which she agreed to work ten hours per week in return for a monthly salary of $10,000.

No. 11-20791

clinic for an initial assessment and any subsequent reassessment. Initially, Imo was responsible for paying the patients who came to CNS as well as the people who referred them. When he was unable to make the payments, he would assign the duties to another employee.

During a patient's first visit to CNS, an employee would collect basic medical information from the patient. Before patients received treatment, CNS had them sign treatment forms, although the forms were intended to serve as a record of the treatment each patient received during his or her visit to CNS. Indeed, CNS often had patients sign multiple blank treatment forms when they visited the clinic. CNS employees, including Imo, would then fill in these blank treatment forms as if the patient received certain services, regardless of whether the patient actually received any treatment. As more patients began to come to CNS, patients would either not undergo any physical therapy or receive treatment from employees not licensed to provide such services.

Initially, Imo handled the billing for CNS; however, as time progressed, Pam Ise and other employees became responsible for billing. Ise instructed employees to bill for certain services regardless of what therapy the patient actually received. In fact, CNS billed Medicare and Medicaid for deceased patients. At one point, CNS billed Medicare for 382 patients in one day. Some patients began to complain to CNS concerning their bills.

Beginning in 2008, Anokam began working at CNS. Witnesses testified that Anokam was in charge of the clinic when Imo was not present, assisted in falsifying data on the forms submitted to Medicare and Medicaid, handled problems that arose, and paid people who came to the clinic complaining that CNS had overcharged them.

4

No. 11-20791

In August 2008, Clardy notified Medicare that she wished to terminate the reassignment of her benefits to CNS. Because of a mistake in her termination application, however, the reassignment was not immediately terminated. Clardy waited almost two months before rectifying the problem; once Medicare received a correct termination application, CNS could no longer bill under Clardy's number. In the notification, Clardy expressed concern about potential legal liability. When Clardy and Dr. Catherina left CNS, they were replaced by two other doctors—Dr. Theresa Rice and Dr. Thaddeus Hume. In March 2009, CNS and the doctors associated with the clinic were placed on prepay review—that is, all claims submitted had to have corroborating documentation before the claims would be paid. Notably, none of CNS's claims were paid once the clinic was placed on prepay review.

## b. Procedural History

Defendants-Appellants were indicted for conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 (count one), health care fraud in violation of 18 U.S.C. §§ 1347 and 2 (counts two through forty),[4] and mail fraud in violation of 18 U.S.C. § 1341 (counts forty-one through forty-three). Imo was indicted for money laundering in violation of 18 U.S.C. § 1957 (counts forty-four through forty-eight), and Anokam was indicted for structuring to avoid reporting in violation of 31 U.S.C. § 5324(a)(3).[5] A jury found Imo, Clardy, and Anokam guilty on multiple counts of health care fraud, conspiracy to commit health care fraud, mail fraud, money laundering, and structuring to avoid reporting requirements. Subsequently, Imo was sentenced to 327 months'

---

[4] Clardy was indicted only on counts two through twenty-eight, not twenty-nine through forty.

[5] Counts forty-nine through fifty-one applied to another defendant not a party to this appeal.

No. 11-20791

imprisonment and ordered to pay $30,216,592.15 in restitution as well as a $4,800 special assessment. Imo objected to the loss calculation and the mass marketing enhancement applied by the district court, but the court overruled the objections. The court also approved a two-level enhancement for willful obstruction or the attempt to obstruct justice.

The court sentenced Clardy to a total of 135 months' imprisonment with three years of supervised release. In addition, Clardy was ordered to pay $15,626,084.01 in restitution and a $1,800 special assessment. Clardy raised a number of objections, including that she was not the medical director for CNS, the 22-level enhancement for intended loss was improper, and the two-level enhancement for mass marketing was not applicable. The district court overruled each of her objections. Clardy also moved for an acquittal or a new trial, which the court denied.

Anokam was sentenced to a total of 151 months' imprisonment. He challenged the amount of loss he was held accountable for, the two-level enhancement for his managerial role in the health care fraud scheme, and the enhancement for mass marketing. He was ordered to pay $19,047,546.88 for restitution and a $2,900 special assessment. Defendants-Appellants timely appealed.

## II.    DISCUSSION

### A. Limiting Instruction

For the most part, Defendants-Appellants raise similar, if not identical, arguments on this issue. They contend that, because there was no limiting instruction, there was a risk the jury improperly found violations of Medicare and Medicaid regulations as sufficient proof of their criminal guilt. Moreover, they argue that the court failed to provide the jury with instructions limiting the evidence of Medicare and Medicaid violations to intent, knowledge, and

motive. In addition, Clardy argues that Federal Rule of Evidence ("FRE") 105 mandated that a limiting instruction be given.[6] Defendants-Appellants' arguments are unavailing.

### 1. Standard of Review

We review a court's failure to give a limiting instruction for an abuse of discretion. *See United States v. Davis*, 609 F.3d 663, 689 (5th Cir. 2010). Reversal is proper "only if the requested instruction (1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense." *United States v. Peterson*, 244 F.3d 385, 394 (5th Cir. 2001) (citation omitted). District courts are entitled to "substantial latitude in formulating a jury charge." *Davis*, 609 F.3d at 689 (internal quotation marks and citation omitted).

### 2. Applicable Law

In *United States v. Christo*, we held that the district court committed reversible error when it permitted the government to produce substantial evidence concerning violations of a civil statute that was irrelevant to the charged crimes. 614 F.2d 486, 492 (5th Cir. 1980). Essentially, the "conviction[] result[ed] from the government's attempt to bootstrap . . . a civil regulatory violation[] into an equal amount of misapplication felonies . . . ." *Id.* The trial court further compounded the error by "focusing the jury's attention to the" civil violations. *Id.* We have interpreted "*Christo* as being principally

---

[6] As an initial matter, we note that, contrary to the Government's argument otherwise, each of Defendants-Appellants requested a limiting instruction at trial.

No. 11-20791

concerned with bootstrapping of civil violations into criminal liability." *United States v. Brechtel*, 997 F.2d 1108, 1115 (5th Cir. 1993) (per curiam).

However, we have "permitted use of civil violation evidence in criminal prosecutions for more limited purposes." *Id.* (collecting cases). In *United States v. Jones*, 664 F.3d 966, 980 (5th Cir. 2011), the prosecution introduced testimony regarding the connection between the alleged crimes, Medicare regulations, and the corresponding state requirements. The defendant asked for a limiting instruction, instructing the jury on keeping any state requirement distinct from the federal crimes at issue in the case. *Id.* We held that the district court did not err when it denied the request. *Id.* at 981. Rather, after considering the jury instructions "as a whole," we found that the jury instructions given "sufficiently articulated to the jury that they were only to consider the federal crimes charged and not any of the state rules and regulations that were discussed." *Id.* In particular, we relied on the district court's statement that the prosecution had to prove the crime alleged in the indictment beyond a reasonable doubt, not any other conduct. *Id.*

Moreover, we have approved the use of regulatory violations to provide clarity in regards to the criminal violations alleged when the prosecution also adequately proved the charged crime. *United States v. Brown*, 553 F.3d 768, 791–92 (5th Cir. 2008). For example, in *United States v. Arthur*, we recognized that the evidence of Medicare violations assisted the jury in understanding the health care fraud scheme and also demonstrated the defendant's intent. 432 F. App'x 414, 423 (5th Cir. 2011) (per curiam) (unpublished). Ultimately, we found that the district court did not commit plain error when it did not give a limiting instruction because 1) the evidence served a permissible purpose; 2) the Government's case did not rely solely on regulatory violations; 3) the Government did not argue that Medicare violations were sufficient proof of the

charged crime; and 4) the district court did not discuss the Medicare violations in the jury instructions. *Id.* We have relied on limiting instructions, *inter alia*, to demonstrate that no harm occurred. *See, e.g., Brechtel*, 997 F.2d at 1115.

Under FRE 105, if evidence is admissible for one purpose but not another, "the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." When a court admits such evidence, "it cannot refuse a requested limiting instruction." *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 266 (5th Cir. 1980). However, the instruction "need not be given in the particular form or manner that is sought by the parties, so long as the general instructions sufficiently serve the limiting purposes of Rule 105." *Id.* In *United States v. Jensen*, we affirmed the district court's refusal to use the defendant's requested limiting instruction and jury instruction because they were covered in the instructions provided by the district court and the court's refusal did not impact the defendant's ability to present his defense. 41 F.3d 946, 953–54 (5th Cir. 1994).

*3. Discussion*

Although it would have been preferable for the district court to provide a cautionary instruction to the jury on the permissible purpose of the Medicare and Medicaid violations, *see Brechtel*, 997 F.2d at 1115, the district court did not abuse its discretion in refusing to give the requested limiting instruction. Aside from the amount of time the prosecution spent demonstrating various regulatory violations, Defendants-Appellants fail to point to any instance during the trial when the prosecution or court utilized the regulations in an impermissible manner. Rather, the district court instructed the jury on the crimes charged and warned the jury that it was not to judge Defendants-

No. 11-20791

Appellants on conduct other than that alleged in the indictments.[7] Defendants-Appellants were free to argue before the jury that the violations were not a sufficient indication of criminal guilt. Indeed, the jury acquitted Clardy of some of the charges although her conduct constituted violations of Medicare and Medicaid regulations. Accordingly, the district court did not abuse its discretion. *See Jones*, 664 F.3d at 981.

Reversal is further not warranted because, based on the record on appeal, Defendants-Appellants' requested jury instructions were "substantially covered in the charge as a whole" and their ability to present a defense was not "seriously impaired." *See Peterson*, 244 F.3d at 394; *Jones*, 664 F.3d at 981. While the instructions discussed Medicare and Medicaid, the discussion was limited to the information necessary to properly charge the jury on its duty. Moreover, the district court did not violate FRE 105 because, as stated above, Defendants-Appellants' concerns were covered by the instructions given by the district court. *See Jensen*, 41 F.3d at 953–54.

## B. Sufficiency of the Evidence

Clardy contends that, while the government successfully demonstrated that she was naïve, careless, and negligent, the evidence does not show that she either knowingly or intentionally violated any criminal laws. We disagree.

### 1. Standard of Review

Sufficiency of the evidence challenges are reviewed de novo. *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). When reviewing the sufficiency of the evidence, a court must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a

---

[7] In fact, the jury charge contained a detailed description of the elements of the charges against Defendants-Appellants.

reasonable doubt." *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (internal quotation marks and citation omitted). Evidence is to be viewed "in the light most favorable to the verdict." *Id.* (internal quotation marks and citation omitted). Moreover, courts are to "accept[] all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict." *Id.* (internal quotation marks and citation omitted).

The evidence presented need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Id.* (internal quotation marks and citation omitted). Furthermore, "any conflict in the evidence must be resolved in favor of the jury's verdict." *Id.* (citation omitted). Nevertheless, we do "not lightly overturn a determination by the trier of fact that the accused possessed the requisite intent." *United States v. Patel*, 485 F. App'x 702, 709 (5th Cir. 2012) (unpublished) (quoting *United States v. Robichaux*, 995 F.2d 565, 570 (5th Cir. 1993) (internal quotation marks omitted)).

2. *Applicable Law*

a. Conspiracy to Commit Health Care Fraud

To establish a conspiracy to commit healthcare fraud, the government must prove: "the existence of an agreement between two or more people to pursue the offense of fraud; the defendant knew of the agreement; and the defendant voluntarily participated in the conspiracy." *United States v. Delgado*, 668 F.3d 219, 226 (5th Cir. 2012) (citations omitted). The conspirators may have a silent and informal agreement. *Grant*, 683 F.3d at 643. Indeed, the "voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *Id.* (internal quotation marks and citation omitted). A defendant need not have actually submitted the fraudulent documentation to

No. 11-20791

Medicaid in order to be guilty of health care fraud or conspiracy to commit health care fraud. *United States v. Girod*, 646 F.3d 304, 313 (5th Cir. 2011). Moreover, the Government may use either direct or circumstantial evidence to prove each element. *Delgado*, 668 F.3d at 226. However, there is insufficient evidence of a conspiracy if the Government has only "pile[d] inference upon inference upon which to base a conspiracy charge." *Grant*, 683 F.3d at 642 (internal quotation marks and citation omitted).

    b.  Health Care Fraud

Under 18 U.S.C. § 1347,

Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
(1) to defraud any health care benefit program; or
(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
in connection with the delivery of or payment for health care benefits, items, or services [commits health care fraud].

18 U.S.C. § 1347.

The Government does not have to prove that the defendant had actual knowledge of or specifically intended to violate the applicable health care fraud statutes. *United States v. Whitfield*, 485 F. App'x 667, 670 (5th Cir. 2012) (unpublished).

    c.  Mail Fraud

To prove that a party has committed mail fraud under 18 U.S.C. § 1341, the Government must demonstrate "(1) the defendant devised or intended to devise a scheme to defraud, (2) the mails were used for the purpose of executing, or attempting to execute, the scheme, and (3) the falsehoods employed in the scheme were material." *United States v. Read*, 710 F.3d 219, 227 (5th Cir. 2012) (internal quotation marks and citation omitted). The

defendant must have known that "the scheme involved false representations." *Id.* (internal quotation marks and citation omitted). "The first element includes a defendant's scheme or artifice . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. . . ." *United States v. Ratcliff*, 488 F.3d 639, 644 (5th Cir. 2007) (internal quotation marks and citations omitted). Moreover, a defendant violates § 1341 each time the mail is used in the scheme. *United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005).

A defendant "acts with the intent to defraud when he acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself." *Id.* (internal quotation marks and citation omitted). We have held that the second element is satisfied when "one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen." *United States v. Ingles*, 445 F.3d 830, 835 (5th Cir. 2006) (internal quotation marks and citation omitted); *see also Read*, 710 F.3d at 227 (holding that the second element was satisfied when Medicare mailed the defendant checks for the fraudulent claims the defendant billed). In *Akpan*, we explained that the Government does not have to prove that a defendant actually used the mail or even "intended that the mails be used." 407 F.3d at 370. Instead, the Government has to establish "that the scheme depended for its success in some way upon the information and documents which passed through the mail." *Id.*

3. *Discussion*

a. Conspiracy to Commit Health Care Fraud

There was sufficient evidence supporting Clardy's conviction for conspiracy to commit health care fraud. In count 1, the government alleged that Clardy engaged in a conspiracy to commit health care fraud. Specifically,

No. 11-20791

it states that from approximately March 2, 2006 to June 26, 2009, she "knowingly and willfully" conspired with Imo and others to defraud Medicare and Medicaid in violation of §§ 1347, 1349.

Our review of the record persuades us that there is sufficient evidence to support Clardy's conviction on count 1. The jury could have inferred an agreement between Clardy and Imo to defraud Medicare and Medicaid through CNS. The Government presented evidence of a letter dated July 25, 2007 from Clardy to Imo threatening legal action if he did not stop billing Medicare and Medicaid through her billing number.[8] Nevertheless, after meeting with Imo, Clardy began working at CNS and receiving payments from CNS. Even before she began receiving compensation from CNS, she signed two employment agreements with Imo, which were dated May 10, 2006.[9] Although Clardy testified that Imo assured her the billing was a mistake and promised to rectify the mistake, the jury was entitled to find otherwise. The jury also could have found not credible her explanations that Ise showed her information indicating that CNS was properly billing Medicare and Medicaid and that Imo forged her signature on the documents sent to Medicare and Medicaid. Indeed, Clardy admitted to signing one of the documents in CNS's Medicare application but stated that she was unaware that it was part of the application process.

While it is *possible* that Clardy's account of the facts is true, the Government's version is also plausible and Clardy has failed to convince us otherwise. The above evidence suggests that she was aware of the agreement and voluntarily participated. Accepting the jury's credibility determinations,

---

[8] Evidence was presented that, from January 2007 to July 25, 2007, CNS billed approximately $8,000,000 by using Clardy's billing information. After the letter was sent, CNS billed approximately $22,000,000 using Clardy's billing number.

[9] One contract stated that she would receive $5,000 in salary while the other said $10,000.

there is sufficient evidence to support Clardy's conviction for conspiracy to commit health care fraud under count 1.

### b. Health Care Fraud

The Government also provided sufficient evidence to support Clardy's health care fraud convictions under counts 5–8, 14–18, 20–21, 23–24, and 26–27 of the second superseding indictment.  In these counts, the Government alleges that, beginning on approximately March 2, 2006 and ending on June 26, 2009, Clardy "knowingly and willfully" defrauded Medicare and Medicaid by submitting fraudulent claims for physical therapy services that were either not provided or provided by unlicensed employees.  Based on the evidence noted above, the jury could reasonably have found that Clardy "knowingly and willfully" defrauded Medicare and Medicaid by submitting false claims.  Clardy stresses that she was unaware of the scheme being run through CNS; however, the jury heard sufficient evidence upon which it could find this assertion unavailing.[10]  Notably, the testimony of both patients and employees indicates that the vast majority of the patients did not receive physical therapy services.  Furthermore, those employees providing physical therapy services were not qualified to do so; the jury reasonably could have determined that it was highly unlikely that Clardy was unaware of what was going on, regardless of her claims to the contrary.

### c. Mail Fraud

Lastly, there was sufficient evidence to support Clardy's mail fraud convictions under counts 41–43 of the second superseding indictment.  Counts 41–43 state that, beginning around March 2, 2006 and ending around June 26,

---

[10] We acknowledge that there was also evidence that CNS employees attempted to ensure that the doctors at the clinic were unaware that patients were paid to come to the clinic.

No. 11-20791

2009, the health care fraud scheme Clardy allegedly was involved in caused Medicare and Medicaid to send payments for fraudulent claims through the United States Postal Service. As demonstrated above, there was sufficient evidence that Clardy entered into a scheme to defraud Medicare. Clardy argues that she was not in charge of the mail and never received any notifications from CNS; however, that is irrelevant to her mail fraud charges. Rather, to prove the second element, the Government only had to prove "that the scheme depended for its success in some way upon the information and documents which passed through the mail." *Akpan*, 407 F.3d at 370. That element is satisfied here because CNS received payment from Medicare and Medicaid through the mail. There also was evidence that the scheme involved material falsehoods. The Government presented evidence that the bills sent to Medicare and Medicaid were fraudulent for a variety of reasons. Some claims purported to have given physical therapy services when no services were actually rendered; other claims asserted that physical therapy services were given by properly qualified individuals when that was not the case; and some claims were submitted for deceased patients. Accordingly, we hold that there is sufficient evidence supporting Clardy's conviction for conspiracy to commit health care fraud, health care fraud, and mail fraud.

**C. Evidentiary Challenges**

At trial, the prosecution cross-examined Clardy on the following: (1) blank prescription forms she signed while working at two pain management clinics; (2) the fact that the clinics required patients to pay cash; and (3) a letter from an anonymous party that was found in her safe, which warned her that prescriptions bearing her name were being sold on the street. While she admitted that she signed the blank prescription forms and had a cash-only policy, she explained that she did not investigate the allegation in the letter

16

No. 11-20791

because she received the letter only a few days or approximately a week before the authorities came and seized the letter.[11]   Clardy contends that the introduction of the above specific acts violated FRE 401, 403, 404(b), and 405. Her arguments are without merit.

### 1.  *Standard of Review*

Evidentiary rulings are reviewed under an abuse of discretion standard, "subject to [a] harmless-error analysis." *Girod*, 646 F.3d at 318.  The admission of evidence is reversible error only when the defendant's rights were "substantially prejudiced" by the admission.  *Id.* at 318–19 (internal quotation marks and citation omitted).

### 2.  *Applicable Law*

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and [] the fact is of consequence in determining the action."  Fed. R. Evid. 401.  FRE 403 excludes relevant evidence "if its probative value is substantially outweighed by a danger of [, *inter alia*,] unfair prejudice."  Fed. R. Evid. 403.  However, a court can reduce the danger of undue prejudice by giving a limiting instruction.  *United States v. Sanders*, 343 F.3d 511, 518 (5th Cir. 2003).  FRE 404(b) prohibits the use of evidence of an act to prove that a person acted in conformity with the character trait that act demonstrates.  Fed. R. Evid. 404(b)(1).  During cross-examination, a party may question a witness on specific acts "if they are probative of the [witness's] character for truthfulness or untruthfulness."  Fed. R. Evid. 608(b)(1).

Once a defendant testifies, "his character for truthfulness [is] in issue." *Sanders*, 343 F.3d at 518.  In *Akpan*, we cautioned that a defendant's choice to

---

[11] She was unclear as to the exact amount of time that transpired.

17

testify "does not give the prosecution free rein." 407 F.3d at 373 (internal quotation marks and citation omitted). Rather, the prosecution may "cross-examine the defendant with respect to instances of misconduct that are clearly probative of truthfulness or untruthfulness, such as perjury, fraud, swindling, forgery, bribery, and embezzlement." *Id.* (internal quotation marks and citation omitted).

### 3. *Discussion*

The district court did not abuse its discretion in permitting the Government to cross-examine Clardy on the blank prescription forms she signed, the cash-only policy at two pain management clinics, and the letter from the anonymous party. Moreover, even if there was error, it was harmless because Clardy was not "substantially prejudiced" by the admission of the evidence. *See Girod*, 646 F.3d at 318.

As we have previously held, the prosecution is permitted to cross-examine defendants on fraudulent acts because they are indicative of the defendant's character for truthfulness. *See Sanders*, 343 F.3d at 519; *Akpan*, 407 F.3d at 373–74. Here, evidence that Clardy signed blank prescription forms at two pain management clinics, which only accepted cash from patients is probative of her character for truthfulness. Because she testified, this character trait was a proper inquiry by the Government. *See Sanders*, 343 F.3d at 518–19. This evidence further implicates Clardy's character for untruthfulness, especially considering Clardy's response to the anonymous letter she received. Admittedly, the evidence of the cash-only policy is not as fraudulent as the other two acts; however, when viewed in the context in which it was introduced—namely, while explaining Clardy's conduct at the other two pain management clinics—it is at least somewhat probative of her character for truthfulness.

Additionally, any prejudice Clardy may have incurred due to the introduction of this evidence was reduced by the limiting instructions given by the district court both after the testimony was introduced and in the jury charge. *See id.* at 518. Moreover, there was sufficient evidence presented at trial indicating that Clardy was guilty of the crimes charged. *See supra* Part B.3. Thus, it is highly unlikely that the Government's cross-examination on this evidence was determinative of the outcome of this case.

None of the other evidentiary violations Clardy alleges are meritorious. The evidence presented was relevant, considering that it dealt with her character for truthfulness and her testimony and credibility were key features of her defense. Moreover, FRE 404(b) is inapplicable to this issue. *See United States v. Morgan*, 505 F.3d 332, 339 (5th Cir. 2007) ("[W]hether Rule 404(b) or Rule 608(b) applies to the admissibility of other-act evidence depends on the purpose for which the prosecutor introduced the other-acts evidence. Rule 404(b) applies when extrinsic evidence is offered as relevant to an issue in the case, such as identity or intent. Rule 608(b) applies when extrinsic evidence is offered to impeach a witness, to show the character of the witness for untruthfulness." (internal quotation marks and citations omitted)). Because this evidence was introduced to discredit Clardy, FRE 608 controls, not 404(b). Consequently, the district court did not err in permitting the Government to cross-examine Clardy on these specific acts.

**D. Sentencing Enhancement Pursuant to United States Sentencing Guideline ("U.S.S.G.") § 2B1.1(b)(1)(L)**

The district court found that Clardy intended a loss of $21,691,203, the amount of fraudulent claims CNS billed Medicaid and Medicare from August 2007 to August 2008, the time period Clardy is alleged to have been a part of the conspiracy. Anokam's intended loss amounted to $28,617,426, which was

also based on the time he was alleged to have been involved in the conspiracy. Clardy asserts that the district court erred in holding her liable for the entire amount CNS fraudulently billed Medicare and Medicaid during August 2007 through August 2008. Anokam also challenges the district court's intended loss computation. Their arguments are unavailing.

### 1. *Standard of Review*

Sentencing decisions by a district court are reviewed for an abuse of discretion. *United States v. Harris*, 597 F.3d 242, 250 (5th Cir. 2010). While factual findings are reviewed under a clear error standard, "the district court's interpretation or application of the Sentencing Guidelines is reviewed de novo." *Id.* (internal quotation marks and citation omitted). The district court has not clearly erred if its findings are "plausible in light of the record as a whole." *Id.* (internal quotation marks and citation omitted). "The district court receives wide latitude to determine the amount of loss and should make a reasonable estimate based on available information." *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007).

### 2. *Applicable Law*

U.S.S.G. § 2B1.1(b)(1) increases the offense level for a particular crime based on the amount of the loss that results from the fraud. Loss is considered "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1) cmt. 3(A). Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* at 3(A)(i). Intended loss "means the pecuniary harm that was intended to result from the offense; and [] includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id.* at 3(A)(ii). In *United States v. Isiwele*, we "endorsed a fact-specific, case-by-case inquiry into the defendant's intent in

determining intended loss for sentencing purposes" in the health care fraud context. 635 F.3d 196, 203 (5th Cir. 2011) (internal quotation marks omitted).

The Government has to prove a defendant's intent by a preponderance of the evidence. *Id.* While the amount billed to Medicare and Medicaid is "prima facie evidence of the amount of loss [the defendant] intended to cause," it is not "conclusive evidence of [the] intended loss." *Id.* (internal quotation marks and citation omitted) (first alteration in original). Rather, "parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent." *Id.* (internal quotation marks and citations omitted).

When reviewing a district court's findings, we "exercise great deference to a district court's credibility findings." *United States v. Hearne*, 397 F. App'x 948, 951 (5th Cir. 2010) (per curiam) (unpublished) (internal quotation marks and citation omitted). In *Hearne*, the defendant contested the district court's intended loss calculation on the basis that the loss should be the amount he was reimbursed for the false claims rather than the amount he billed. *Id.* at 950. The district court found that even assuming he knew that he would not be fully reimbursed, he sent Medicare and Medicaid bills with the intention that he would be paid. *Id.* at 951. We found there was sufficient evidence to support the district court's finding even though (1) some of the evidence suggested the defendant was knowledgeable of Medicare's billing policies and (2) the defendant hired others to oversee the billing. *Id.*

*3. Discussion*

The district court did not err in its intended loss calculation. The Government only had to prove the amount of the intended loss by a preponderance of the evidence. *See Isiwele*, 635 F.3d at 203. Although there was evidence contradicting the intended loss amount, the Government carried

No. 11-20791

its burden as to both Clardy and Anokam. First, there was evidence that Clardy signed the Medicare application for CNS with Imo and was hired by CNS to oversee and conduct physical therapy services there. Although Clardy claimed her signature was forged, the district court reasonably could have found her testimony not credible. Second, Clardy worked for CNS after sending CNS a letter demanding that it stop billing Medicare under her number. She attempted to explain her reason for working after she sent the letter; however, again, the district court was entitled to find that it was not credible. Admittedly, there was evidence that Ise was responsible for billing. Nevertheless, there was sufficient evidence upon which the district court could find that Clardy intended to cause a loss of $21,691,203, the amount CNS billed Medicare during the year she worked at CNS. *See Hearne*, 397 F. App'x at 951.

The Government also carried its burden in regards to Anokam. Testimony was elicited at trial that he had a managerial role in CNS and participated with the billing. Moreover, there was testimony that he created false patient files, hired employees, paid patients and recruiters, and was one of only a few employees at CNS who had access to the mail. While he contested his involvement, the Government only had to prove the intended loss amount by a preponderance of the evidence. *See Isiwele*, 635 F.3d at 203. Furthermore, Anokam's contention that the district court conflated his possible knowledge of the scheme with intent is unavailing as there was sufficient evidence for the court to have found that he did intend to cause that loss.[12]

### III.  CONCLUSION

---

[12] Anokam also challenges the district court's imposition of a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(ii) for mass marketing. However, he acknowledges that this issue is foreclosed by our decision in *Isiwele*, 635 F.3d 196. We therefore hold that the district court did not err by imposing a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(ii). *See Isiwele*, 635 F.3d at 203–05.

No. 11-20791

For the foregoing reasons, we AFFIRM Defendants-Appellants' convictions and sentences.