# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-10963

United States Court of Appeals
Fifth Circuit

**FILED**
August 12, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

TERRY LYNN ANDERSON; ROCKY FREELAND ANDERSON,

      Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:17-CR-222-1
USDC No. 3:17-CR-222-2

Before DENNIS, SOUTHWICK, and HO, Circuit Judges.

PER CURIAM:*

Following a 10-day jury trial, the defendants were convicted of multiple counts of health care fraud and multiple counts of aggravated identity theft based on their submission of fraudulent insurance claims. On appeal, the defendants argue there was insufficient evidence to sustain conviction. We AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-10963

FACTUAL AND PROCEDURAL BACKGROUND

Terry Anderson owned an optical and hearing aid business, Anderson Optical and Hearing Aid Center ("AOHAC"), in Tarrant County, Texas, which employed his son Rocky Anderson. AOHAC provided both eyewear and hearing aids to individuals from its Arlington and Bedford locations. This case concerns hearing aids.

In Texas, three types of health care professionals may perform certain hearing tests and dispense hearing aids: physicians, audiologists, and fitters and dispensers. Generally, a physician who is an ear, nose, and throat specialist must have an undergraduate degree and a medical degree, and complete a residency program, while an audiologist must have both an undergraduate and a graduate degree. A fitter and dispenser must have a high school diploma and pass a licensing examination administered by the Texas Department of Licensing and Regulation. TEX. OCC. CODE §§ 402.202–203. Consistent with the varying education requirements, the roles of these professionals differ. Physicians and audiologists are licensed to conduct examinations, make medical diagnoses, and dispense hearing aids, while fitters and dispensers are licensed to "measure[] . . . human hearing . . . to make selections, adaptions, or sales of hearing instruments." TEX. OCC. CODE § 402.001(4).

Both Terry and Rocky Anderson are licensed hearing aid fitters and dispensers. We use their first names when necessary to distinguish and use the Andersons when it is not. Terry worked at the AOHAC Arlington location, Rocky at the AOHAC Bedford location.

In 2012 and 2013, Blue Cross Blue Shield of Texas ("BCBS") received over 2000 claims from AOHAC, an in-network provider for BCBS, for hearing aids ordered for American Airlines employees and family members of

2

No. 19-10963

employees. Although the parties offer competing reasons for this number of claims, they do not dispute that this was a drastic increase from previous years. This surge in claims caught the attention of American. Following an internal investigation, American instructed BCBS, the contracted third-party administrator of American's self-funded employee health insurance plan, to stop paying claims for hearing aids from AOHAC.

BCBS contacted the Federal Bureau of Investigation regarding the claims it received from AOHAC in 2012 and 2013. Following a criminal investigation, Terry and Rocky were indicted in federal court in the Northern District of Texas for one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349, ten counts of health care fraud and aiding and abetting in violation of 18 U.S.C. §§ 1347 and 2, and four counts of aggravated identity theft and aiding and abetting in violation of 18 U.S.C. §§ 1028A and 2. The indictment alleged that the two men "conspired to defraud, and did defraud" BCBS and that "BCBS was a 'health care benefit program' as defined by 18 U.S.C. § 24(b), that affected commerce, and as that term is used in 18 U.S.C. § 1347." The aggravated identity theft charges were based on the wrongful use of another person's identification during the commission of the health care fraud offenses. A jury trial on the charges took place from February 20 to March 8, 2018.

During trial, it was established that American offered health insurance to its employees under the airline's self-funded health insurance plan ("Plan"). American drafted the benefits and offered, provided, and paid for the benefits. Benefits were paid out of American's coffers. BCBS's role was to be the Plan administrator, which required processing paperwork, making available its network of providers like AOHAC, and paying claims in accordance with American's benefits. American reimbursed BCBS weekly for paid claims and paid BCBS a monthly administrative fee.

3

No. 19-10963

At the close of the Government's case-in-chief, both Andersons moved for judgments of acquittal under Federal Rule of Criminal Procedure 29, arguing there was insufficient evidence to prove conspiracy to commit health care fraud, health care fraud, and aggravated identity theft. The district court requested briefing from the Government and carried the motions for acquittal with the case. At the close of all the evidence, the Andersons renewed their motions, which the district court again carried with the case. The jury found Terry guilty on all counts and found Rocky guilty on all counts except two substantive counts of health care fraud.

Following their respective guilty verdicts, the Andersons renewed their motions for judgments of acquittal on the basis that the evidence was insufficient. The district court granted an acquittal of conspiracy to commit health care fraud and of one substantive count of health care fraud. In denying acquittal as to the remaining counts of conviction, the district court concluded that although American provided the benefits and services under the Plan, BCBS qualified as a health care benefit program because it acted as American's agent regarding the Plan. The district court held that the evidence was sufficient to convict both Andersons of health care fraud because the insurance claims submitted by AOHAC included an implicit misrepresentation of "medical necessity" and that the evidence was also sufficient to sustain a conviction for aggravated identity theft. Terry was convicted of nine counts of health care fraud and aiding and abetting, and four counts of aggravated identity theft and aiding and abetting. Rocky was convicted of seven counts of health care fraud and aiding and abetting, and four counts of aggravated identity theft and aiding and abetting.

The district court sentenced Terry to 96 months of imprisonment followed by 3 years of supervised release and ordered $13,688,214.34 in restitution to BCBS pursuant to the Mandatory Victims Restitution Act of

4

No. 19-10963

1996, which Terry was ordered to pay jointly and severally with Rocky. The district court sentenced Rocky to 84 months of imprisonment followed by 3 years of supervised release and ordered $8,443,054.29 in restitution, to be paid jointly and severally with Terry, to BCBS.

## DISCUSSION

The only appellate issues concern the sufficiency of evidence. Our review of the denial of a motion for a judgment of acquittal challenging the sufficiency of the evidence is *de novo*. *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018). We will affirm a jury verdict "unless, viewing the evidence and reasonable inferences in light most favorable to the verdict, no rational jury could have found the essential elements of the offense to be satisfied beyond a reasonable doubt." *Id*. (quotation marks omitted). We first review the evidence as to health care fraud, then that on aggravated identity theft.

### I.     *Health care fraud*

To support a conviction under 18 U.S.C. § 1347, the Government must prove that the defendant "knowingly and willfully executed 'a scheme or artifice — (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises,' any health care benefit program's money in connection with the delivery of or payment for health care services." *Ganji*, 880 F.3d at 777 (quoting 18 U.S.C. § 1347(a)). On appeal, both defendants argue the Government failed to prove essential elements of the offense of health care fraud, namely, that BCBS is a health care benefit program under these facts and that any fraud occurred.

### A.     *Health care benefit program*

An essential element of health care fraud is that the fraud was perpetrated on a health care benefit program. *See* § 1347(a)(2). Such a

5

program is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b).

In their motions for acquittal, the Andersons argued that BCBS, as the third-party administrator of American's Plan, did not meet the statutory definition of a health care benefit program. The district court held that there was sufficient evidence for a rational juror to conclude that BCBS was a health care benefit program because "BCBS was the agent of [American], such that any conduct on BCBS's part was attributable to" American. We will discuss two out-of-circuit opinions that the district court relied on for its conclusion.

A Pennsylvania district court opinion dealt with a defendant who was indicted for defrauding the principal, *i.e.*, Medicare, not a third-party administrator. *United States v. McGill,* No. 12-112-01, 2016 WL 8716240, at *1–2 (E.D. Pa. May 13, 2016). The district court reasoned that the third-party administrator could be viewed as an agent of Medicare and any actions the administrator took could be attributable to Medicare. *Id.* at *6–7. Thus, there was sufficient evidence to show that, by submitting claims to the third-party administrator, the defendant had defrauded Medicare. *Id.* *McGill* is not particularly helpful because the facts there would be equivalent to this case only if the indictment here concerned defrauding American rather than BCBS.

The other case relied on by the district court is an unpublished Fourth Circuit opinion. *United States v. Makarita,* 576 F. App'x 252 (4th Cir. 2014). The defendant was charged with health care fraud for submitting fraudulent claims for dental services to the third-party administrator of an employer's self-funded insurance plan. *Id.* at 254. The administrator would pay the claim, and the employer would reimburse the administrator. *Id.* at 257–58. That

court held that the administrator was the agent for the health care plan provider, which meant any fraud on the administrator was fraud on the health care benefit program. *Id.* at 264. We find it unnecessary to embrace what appears to be a novel approach of applying agency principles in deciding what is a health care benefit program under Section 1347.

Setting aside the caselaw on which the district court relied, we start with the statutory definition of "health care benefit program," which is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." § 24(b).

The Andersons argue that BCBS cannot be a health care benefit program because the plan under which medical benefits were provided was not an American Plan, and BCBS did not provide any medical benefit or service. So restrictive a reading of the statute is inconsistent with our caselaw. For example, we once interpreted Section 24(b) as including automobile insurance companies. *United States v. Collins*, 774 F.3d 256, 260 (5th Cir. 2014). There, the defendants were convicted of counts of conspiracy to commit health care fraud. *Id.* at 259. On appeal a defendant argued that the automobile insurance companies he defrauded did not meet the definition of "health care benefit program." We disagreed. "To the extent automobile insurers pay for medical treatment, they are health care benefit programs under the statute." *Id.* at 260. The specifics of that application of the statute are not terribly important for us, but its direction to apply a broad meaning to "health care benefit program" is relevant guidance.

The definition in Section 24(b) of a "health care benefit program" begins with categorizing the term broadly as a "public or private plan or contract, affecting commerce." § 24(b). The "program," thus, is the plan or contract

under which medical benefits to an individual are provided. The definition continues by saying the program includes an "entity who is providing a medical benefit, item, or service." *Id.* American entered a contract to allow BCBS to administer American's Plan. Under the terms of that contract, BCBS agreed to process claims, make available its network of providers, and pay claims in accordance with American's benefits. American agreed to reimburse BCBS weekly for the claims BCBS paid and to pay BCBS a monthly administrative fee for its services.

Under the plain text of the statute, an administrator's payment to a health care provider who has furnished services or equipment to an individual is the provider of a "medical benefit, item, or service." BCBS under this Plan was a health care benefit program as defined by Section 24(b). That is so even if American was also such a program.

### B. *Sufficiency of the evidence*

The Andersons insist the evidence was insufficient to sustain their convictions of health care fraud because of the absence of any evidence that they made any explicit or implicit fraudulent representations, that they had the intent to defraud, or that their alleged false representations were material.[1] We look at each claimed shortfall.

### 1. *Implied representation of medical necessity*

According to the district court, by submitting the insurance claims forms ("CMS1500 forms"), the Andersons implicitly represented the hearing aids they were dispensing were medically necessary. The Andersons argue that implicit health care fraud is not cognizable. They provided no caselaw, and we

---

[1] Although both defendants were convicted of health care fraud and aiding and abetting, they waived challenges to their aiding and abetting convictions by failing to brief the issue in an adequate manner. *See United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001).

found none, to support their argument.  There is law as to fraud committed for a different purpose, mainly against a bank, which may be proven with implicit misrepresentations.  *United States v. Briggs*, 965 F.2d 10, 12 (5th Cir. 1992).  We conclude that an implicit misrepresentation theory of health care fraud is valid.

We next consider the evidence to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Kuhrt*, 788 F.3d 403, 413 (5th Cir. 2015).  "Our review is limited to whether the jury's verdict was reasonable, not whether we believe it to be correct."  *Id.* (quotation marks omitted).  Nonetheless, we acknowledge as we start our summary that there is not much evidence on the question of whether submission of CMS1500 forms implied that hearing aids were medically necessary.

The language in American's pre-2014 Plan was not clear as to whether a determination of medical necessity was required for hearing aids.  The CMS1500 form did not ask a provider whether a service or item was medically necessary.  Nonetheless, three BCBS employees and one American employee testified that BCBS would not pay a claim unless the service or item provided was medically necessary.  One of the witnesses was the BCBS employee who managed the processing of claims for American in 2011, 2012, and 2013.  She testified that any type of claim to be paid on an insurance policy must be medically necessary.  The American Plan, as she understood it, required hearing exams and hearing aids to be medically necessary.  The BCBS medical director in Texas for managed care testified that she was not aware of any item, service, prescription drug, or anything else for which BCBS provides a benefit that was not required to be medically necessary, including hearing aids.  The director of special investigations for BCBS testified that BCBS does not pay for claims unless they are medically necessary.  Similarly, the senior

manager of benefit strategy for American testified that if a medical service or supply is not medically necessary, then it is not covered by American's Plan, including hearing aids.

The parties presented competing testimony as to whether the Andersons, as licensed hearing aid fitters and dispensers, could make a determination of medical necessity at all. Although there was testimony that no objective test existed to determine medical necessity, there was also testimony that BCBS listed a standard group of tests on its website for providers to use in their "initial work-up of a patient with hearing impairment." These standard tests remain a source of disagreement because, as pointed out during trial, fitters and dispensers are not authorized to conduct all the tests on this list. Further, the district court decided not to instruct the jury regarding medical necessity. In so deciding, the district court stated that the issue of whether medical necessity was required was "clear as mud."

Because we resolve conflicting evidence in favor of the jury's verdict, *see United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011), we conclude that the jurors were not irrational in finding that the submission of CMS1500 forms implied medical necessity. To hold the Andersons criminally liable for these implicit representations, though, the Government must provide evidence that they executed a fraudulent scheme to defraud BCBS with knowledge that the relevant hearing aids were not medically necessary. *See* § 1347. That is the next evidentiary issue.

### 2.    *Intent to defraud*

The Andersons argue they lacked the specific intent to defraud BCBS because they had no knowledge of the requirement that all claims submitted to BCBS must be medically necessary. The district court provided the jury with an instruction regarding the requisite criminal intent to defraud. The court explained that a defendant "acts with the 'requisite intent to defraud' if

the defendant acted knowingly and with the specific intent to deceive." The district court further instructed the jury that an honestly held opinion or belief cannot constitute fraudulent intent even if that opinion or belief is mistaken. The court explained that "evidence of a mistake in judgment, an error in management, or carelessness cannot establish fraudulent intent. But an honest belief does not constitute good faith if the defendant intended to deceive others by making representations the defendant knew to be false or fraudulent."

The jury was presented with competing evidence regarding the Andersons' knowledge of this medical necessity requirement. It does not matter whether the defendants personally filled out or submitted the forms for the claims. Culpable participation in healthcare fraud can exist regardless of whether someone else prepared or submitted the fraudulent documentation. *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014). The evidence at trial was that the office managers for the Arlington and Bedford locations would fill out and submit the CMS1500 forms only after one of the Andersons instructed them to do so.

Although Terry testified that no one at BCBS ever communicated with him on how to fill out CMS1500 forms or discussed with him the "sort of tests" he would conduct before dispensing hearing aids, the jury was presented with evidence from which it could infer fraudulent intent. For example, the jury could have credited the testimony of the Government's expert witness who testified that it is generally known by those recommending hearing aids that medical necessity must be shown to submit an insurance claim. The jury also could have credited the testimony of two licensed fitters and dispensers who each testified that fitting an individual for hearing aids involves more than just a pure tone test, which was often the only test conducted by the Andersons on the American employees. In fact, both fitters and dispensers testified that

a pure tone test was commonly used to screen an individual's hearing and not to fully test that person's hearing.

Undisputed at trial was the fact that it takes anywhere from 30 minutes to an hour to conduct a full hearing test. Conflicting evidence existed in this case regarding the amount of time the Andersons spent testing individuals for hearing aids. Terry testified that both he and Rocky spent at least 25 to 30 minutes, "if not slightly more," testing the hearing of each individual during airport visits. Other evidence was that Rocky was not adequately testing individuals for hearing aids and at times spending "ten minutes or less" testing. Jurors could have placed weight on an exchange between Terry and the prosecutor regarding a specific day in 2012 where AOHAC submitted 102 claims to BCBS. It was during this colloquy that the prosecutor established that for AOHAC to submit 102 claims in one day, Terry and Rocky would had to have tested approximately 170 individuals. Based on Terry's testimony that he and Rocky worked 14-hour days testing individuals at the airport, the prosecutor calculated that, on this particular day in 2012, the Andersons would have had to spend under 10 minutes testing each individual in order to test 170 American employees.

Moreover, even assuming that a pure tone test alone is sufficient to test whether hearing aids were medically necessary, the jury heard evidence that undermined the reliability of the Andersons' airport tests. Multiple witnesses testified that pure tone tests must be conducted in a sound-proof environment, and failure to do so could result in an invalid test. At minimum, the evidence was that if testing is conducted outside of a sound-proof environment, then an ambient-noise test should be conducted to measure background noise. During their airport visits, though, the Andersons neither tested in a sound-proof environment nor conducted an ambient noise test.

No. 19-10963

Last, the jury was presented with considerable evidence that the Andersons falsified client records. On multiple occasions, for example, certain test scores were recorded for clients even though the tests used to produce such scores were never conducted. There was evidence of multiple occasions in which BCBS was billed for hearing aids for individuals who were never tested at all. The billing documents were signed by either Terry or Rocky. Accordingly, the jury could have reasonably inferred that the Andersons acted with the requisite criminal intent based on the prosecution's presentation of falsified client files. *See United States v. Sanjar*, 876 F.3d 725, 746 (5th Cir. 2017) (concluding that falsification of medical charts amounted to strong indicia of fraud).

The Andersons compare their case to one in which we reversed convictions for health care fraud and aiding and abetting, holding there was insufficient proof of knowledge. *Ganji*, 880 F.3d at 777–78. We found insufficient evidence to support a defendant's conviction for health care fraud because the evidence supported an inference that a patient was not actually homebound but did not support "a second inference that [the defendant] *knew* the patient was not homebound." *Id.* In *Ganji*, the defendant doctor rarely personally visited the patients she certified for home care. *Id.* at 771. Both Andersons here at least purported to be the ones actually testing American employees for whom they recommended hearing aids.

We accept the credibility choices and inferences made by the jury. The evidence was sufficient to find that the Andersons acted with the specific intent to defraud BCBS. *See Umawa Oke Imo*, 739 F.3d at 235.

### 3. *Materiality*

Last, the Andersons argue there was insufficient evidence to support their convictions because any implicit misrepresentation of medical necessity was immaterial to BCBS's decision to pay AOHAC's claims. This argument

fails because the jury heard and must have accepted testimony that BCBS would not pay for a service or item that was not medically necessary. *See id.*

## II.    *Aggravated identity theft*

Both Andersons were convicted of four counts of aggravated identity theft. To sustain a conviction of aggravated identity theft, the Government must prove defendants "(1) knowingly used (2) the means of identification of another person (3) without lawful authority (4) during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c)." *United States v. Mahmood*, 820 F.3d 177, 187 (5th Cir. 2016).

The Andersons first argue there is insufficient evidence to sustain their convictions of aggravated identity theft because there was insufficient evidence of health care fraud, the underlying felony. We have already held otherwise.

Next, the Andersons argue the evidence at trial was insufficient to connect either one of them to the clients named in counts 12 through 15. The Government identifies what it says is that evidence. Christine Rea, the client in count 12, testified that she thought Terry conducted her hearing test, and Rocky's signature appears in her client file, signing off on a test that he did not conduct. Trever Wasiqi, named in count 13, did not testify at trial. Wasiqi's parents, however, testified that Trever's hearing was never tested at AOHAC. Nonetheless, a CMS1500 form was submitted by AOHAC to BCBS for hearing aids for Wasiqi, and BCBS paid the claim. The CMS1500 form that was submitted by AOHAC for Wasiqi's hearing aids was signed by Terry and included the address of the Bedford location, where Rocky worked. Belete Chekol, the patient named in count 14, testified that he signed up for a hearing test while at work. According to Chekol, he gave two men, a father and son, his insurance card and they made a copy of it. At trial, Chekol indicated the Andersons were the two men he spoke with regarding a hearing test. Although

Chekol did not have his hearing tested that day and was never contacted to schedule a test, BCBS was billed for hearing aids that Chekol never received. In Chekol's client file, Rocky's handwritten initials are on a document apparently signing off on a hearing test that Rocky never conducted. Last, Govardhan Ramachandran, named in count 15, testified that he had his hearing tested during a health fair at the airport. The AOHAC Bedford office calendar indicated that Rocky was conducting hearing tests at the airport on the day Ramachandran was tested, and Ramachandran testified that a white male in his thirties conducted his hearing test. Rocky fits this description. Although a purchase agreement listed Terry as the dispenser of Ramachandran's hearing aids, Ramachandran testified that he never picked up the hearing aids in question because he did not need them.

There is direct or circumstantial evidence linking both Andersons to the clients identified above. It would not be irrational for a jury to find the evidence was sufficient to convict the Andersons for aggravated identity theft.

AFFIRMED.