# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 15-20416

————

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

DENNIS BARSON, JR.; DARIO JUAREZ,

Defendants - Appellants

United States Court of Appeals
Fifth Circuit

**FILED**

December 28, 2016

Lyle W. Cayce
Clerk

————————

Appeals from the United States District Court
for the Southern District of Texas

————————

Before REAVLEY, DAVIS, and JONES, Circuit Judges.

PER CURIAM:

Defendants appeal their convictions for conspiracy to commit health care fraud and several substantive counts of health care fraud. Defendants primarily challenge the sufficiency of the evidence, the court's deliberate ignorance jury instruction, a number of evidentiary rulings, and the enhancements applied to their sentences. We AFFIRM.

I.

Defendants Dennis Barson, Jr. and Dario Juarez were charged with one count of conspiracy to commit health care fraud under 18 U.S.C. § 1349 (Count 1) and nineteen counts of health care fraud under 18 U.S.C. § 1347 (Counts 2 through 20). After a jury trial, both Defendants were convicted on all 20

No. 15-20416

counts.  The district court sentenced Barson and Juarez to 120 and 130 months of imprisonment, respectively, followed by three years of supervised release. The court also ordered forfeiture and restitution.

Defendant-Appellant Barson was recruited by Edgar Shakbazyan to serve as the medical director for a diagnostic clinic under Shakbazyan's control in Houston, Texas.  Shakbazyan was the manager of the clinic and handled the financial affairs of the clinic.  He was indicted in a multi-count indictment in this case and was convicted pursuant to his plea of guilty.

At Shakbazyan's request, Barson signed a blank form so the clinic could apply for and obtain a Medicare number to be used to bill Medicare for its services.  Barson opened a bank account in his name where Medicare reimbursements could be deposited.  Barson also signed a number of blank checks and gave them to Shakbazyan so he could draw on the account.

The clinic opened on June 8, 2009.  For $7,000 per month, Barson traveled from Austin to Houston every other Saturday to review patient files. The clinic was set up to perform EKGs, ultrasounds, electrocardiograms, spirometer tests, and physical exams performed by a physician's assistant. Medicare was billed for 9,339 procedures for tests performed on 429 beneficiaries using Barson's Medicare number.  Hundreds of the claims were for rectal sensation testing and electromyography studies of the anal or urethral sphincter, which the clinic could not and did not perform.  At trial, several of the clinic's patients testified they went to the clinic because they were paid to do so and some never received any medical services.  Barson testified he never reviewed bank statements, Medicare remittances, or concern himself with any of the financial affairs of the clinic.

Defendant-Appellant Juarez worked at the clinic and claimed to be a physician's assistant working under Barson's supervision.  Juarez, who had no

No. 15-20416

formal medical training, held himself out to patients as a physician and was the medical staff member at the clinic.

Barson closed the clinic on July 30, 2009, after he suspected that the clinic was not above board; however he notified no one of his suspicions.

Several suspicious circumstances came to Barson's attention. In the weeks leading up to closing the clinic, Barson made a number of unsuccessful attempts to reach the California doctor who reviewed ultrasounds for the clinic. Barson also learned in July that Shakbazyan was lying about his true identity. On August 4, a Medicare contractor in charge of waste, fraud, and abuse, opened an investigation into the clinic and tried unsuccessfully to contact Barson by phone. On August 11, Barson closed the clinic bank account set up to receive Medicare reimbursements. Upon receiving his 1099 tax form in February 2010, Barson learned that the clinic's bank account in his name received approximately $1.2 million in Medicare reimbursements. In his testimony, he claimed this was his first notice that this large sum had been deposited in his account during the approximately two months the clinic had been open.

## II.

Sufficiency of the evidence challenges are reviewed de novo.[1] In doing so, this Court must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[2] The Court should accept "all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict."[3]

## III.

---

[1] *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014) (citing *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012)).

[2] *Jackson v.* Virginia, 443 U.S. 307, 319 (1979); *Umawa Oke Imo*, 739 F.3d at 235 (quoting *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)).

[3] *Umawa Oke Imo*, 739 F.3d at 235.

No. 15-20416

Sufficiency of the Evidence

Defendants' primary challenge on appeal is to the sufficiency of the evidence to establish both the conspiracy count and the substantive counts for health care fraud.

To establish a conspiracy to commit health care fraud, the government must show "the existence of an agreement between two or more people to pursue the offense of fraud; the defendant knew of the agreement; and the defendant voluntarily participated in the conspiracy."[4] The agreement may be silent and informal between the conspirators.[5] Further, "voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances."[6] The defendants need not have personally submitted the necessary forms requesting reimbursement from Medicare to be guilty of health care fraud or conspiracy to commit health care fraud.[7] The government may use direct or circumstantial evidence to prove each element.[8]

At trial, both Barson and Juarez argued they had no knowledge of the fraudulent activity, let alone an agreement to commit fraud.

Barson based his argument that he had no knowledge of fraudulent activity on his lack of experience. Before taking the job as the medical director for the clinic, Barson was a physician in the Navy and worked a short time in private practice. When he was hired by Shakbazyan to work for the clinic, Barson was working as a neurology resident in Austin, Texas. On a resident's salary, he argued, he needed the extra money the job at the clinic would

---

[4] *United States v. Delgado*, 688 F.3d 219, 226 (5th Cir. 2012).

[5] *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012) (citing *United States v. Williams-Hendricks*, 805 F.2d 496, 502 (5th Cir. 1986)).

[6] *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009).

[7] *Umawa Oke Imo*, 739 F.3d at 235.

[8] *Id.* (citing *Delgado*, 668 F.3d at 226).

4

No. 15-20416

provide.  Barson had no prior experience with Medicare or medical billing practices in any of his prior positions.  Barson argued that he had no way of knowing about the fraudulent scheme because he never saw any patient files that included many of the tests the clinic billed Medicare for.  Barson testified that the patient files he reviewed included services that the clinic was set up to provide: EKGs, ultrasounds, electrocardiograms, spirometer tests, and physical exams performed by a physician's assistant.  Because he was hired in this limited role to review patient files set aside for him twice a month, Barson maintained that he had no way of knowing that the clinic was engaged in fraudulently billing Medicare.

Similarly, Juarez argued that even though he was impersonating a physician's assistant, he had no knowledge of or access to any of the facility's billing systems.

The government presented ample circumstantial evidence to establish both Defendants' knowledge of the ongoing health care fraud.  Barson signed documents in blank allowing the clinic to bill under his Medicare identification number and opened a bank account in his name to receive Medicare reimbursements.  He signed a number of blank checks to permit Shakbazyan to draw on the account.  He allowed the bank statements to be sent to the clinic and never reviewed them.  Barson received a significant sum, $7,000 per month, for reviewing patients' charts every other Saturday.  Barson admitted to an FBI investigator that despite his suspicions and bad feelings about the clinic, he reported his suspicions to no one.  He quietly closed the clinic on July 30.  Barson did not monitor the bank account in his name or review any Medicare remittances that went to the clinic. Upon receiving his 1099 tax form showing that the clinic bank account received nearly $1.2 million, Barson again failed to contact Medicare to report his concerns.

5

No. 15-20416

The government also established that Juarez was aware he was participating in a scheme to commit Medicare fraud. Juarez held himself out as a "doctor" at the clinic and falsely claimed to Barson that he was a physician's assistant, the clinic's on-site medical staff member. Juarez saw almost all of the patients and turned a blind eye to the fact that most of the so-called patients had no need for medical care and that many received no medical care. He saw large numbers of patients lining up outside the clinic daily after being delivered to the clinic by the same white van. Juarez had access to the clinic's mail including the bank statements and Medicare remittances. Juarez was paid $20,000 for his work, a large sum for an unlicensed individual to pose as a physician's assistant. He lied to investigators about the payments he received. Juarez also gave conflicting testimony to an FBI investigator about an alleged break in at the clinic and missing patient files.

Barson also argues that the evidence was insufficient to establish an "agreement" to commit health care fraud. His arguments closely track his arguments on the knowledge element and fails for similar reasons.

The evidence established that Barson and Shakbazyan agreed that (1) Barson would apply for a Medicare number; (2) Barson would allow the clinic to use that number to bill Medicare; and (3) Barson would receive $7,000 per month for reviewing files every other Saturday. The evidence established that Shakbazyan set up the fraudulent scheme and had intimate knowledge of the details of the fraud.

Juarez agreed with Skakbazyan to work at the clinic as the medical staff member and hold himself out as a physician's assistant to Barson and as a physician to the patients.

The jury was also entitled to find that the Defendants committed health care fraud on the substantive counts of the indictment. Each substantive count was based on a separate request for Medicare reimbursements that the

6

government established were not for medical services needed or provided. 18 U.S.C. § 1347 sets forth the elements of the offense:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud any health care benefit program; or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services [commits health care fraud].[9]

Here, the jury was entitled to convict Defendants pursuant to the *Pinkerton* doctrine, which imposes criminal liability on all conspirators for the acts of other co-conspirators when those acts are foreseeable.[10]   Because the evidence was sufficient to convict Defendants on the conspiracy count, the jury was entitled to convict them on the substantive counts as well.  The Defendants were responsible for the acts of co-conspirator Shakbazyan who actually submitted or caused to be submitted the fraudulent claim forms for Medicare reimbursement.

Deliberate Ignorance Instruction

Defendants argue next that the district court erred in giving the deliberate ignorance instruction. [11]  The evidence summarized above raised a

---

[9] 18 U.S.C. § 1347(a).

[10] *Pinkerton v. United States*, 328 U.S. 640 (1946).

[11] The district court instructed the jury,

The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.  You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him.  While knowledge on the part of the

legitimate issue of whether Barson and Juarez turned a blind eye to the fact that Medicare was being billed large sums for services not performed. Barson's acts in signing blank forms to allow Medicare to be billed for procedures under his number, opening a bank account in his name for the reimbursements, and signing blank checks for Shakbazyan to draw on the account was sufficient to permit the jury to infer that Barson took pains to avoid personal knowledge of incriminating facts. Barson's failure to review any remittances from Medicare or bank statements from his own bank account could have been viewed similarly. Juarez relied on his lack of medical training and his unfamiliarity with the Medicare forms to argue that he suspected no wrongdoing. Our precedent supports submission of "a deliberate ignorance instruction 'when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference.'"[12] The record clearly authorized the district court to give the instruction and the court did not abuse its discretion in giving it.

Object of the Conspiracy

Next, Defendants argue that the district court abused its discretion by rejecting their proposed instruction on the object of the conspiracy. Defendants complain that the district court did not instruct the jury that the government was required to prove the object of the conspiracy in the exact language of the indictment. The court instructed the jury that the object of the conspiracy was

---

defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact. However, if you find that the defendant actually believed the Medicare claims being filed were not fraudulent, then you must acquit the defendant. **ROA.3212. (objection); ROA.3238-39. (instruction).** *See* Fifth Circuit Pattern Jury Instructions (Criminal Cases) 1.37A.

[12] *United States v. Vasquez*, 677 F.3d 685, 696 (5th Cir. 2012) (quoting *United States v. Threadgill*, 172 F.3d 357, 368 (5th Cir. 1999)).

No. 15-20416

"health care fraud, in violation of Title 18, United States Code, Section 1347."

At Barson's request, the court also charged:

> Specifically, as to each defendant under consideration, it was an object of the conspiracy that the defendant and others known and unknown to the grand jury unlawfully enrich themselves by falsely and fraudulently representing to Medicare that certain services and procedures were performed for Medicare beneficiaries when, in fact, the defendant well knew the services and procedures were not being performed.[13]

The Defendants contend the court erred in failing to instruct the jury that the government was required to prove these facts. We find no abuse of discretion in the district court's instruction. The district court instructed the jury on the object of the conspiracy that tracks the Fifth Circuit pattern jury instructions, which we have approved.[14] The above instruction makes it clear that it is describing *an* object of the conspiracy. The government is not required to prove all facts alleged in the indictment as long as it proves certain facts which satisfy the elements of the offense.

Evidentiary Rulings

Defendants raise a number of evidentiary objections in brief including: whether the district court erred in admitting the testimony of the executive director of the Texas Medical Board; whether the cross-examination of the FBI

---

[13] **ROA.3236-37.** The district court instructed the jury on the following elements of health care fraud:

> For you to find one or both defendants guilty of this crime, you must be convinced that the government has proved for the defendant then under consideration each of the following beyond a reasonable doubt: First, that two or more persons made an agreement to commit the crime of health care fraud as charged in the indictment. Second: That Dennis B. Barson, Jr. and Dario Juarez knew of the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose.

**ROA.3237-38.**

[14] *United States v. Whitfield*, 590 F.3d 325, 354 (5th Cir. 2009) ("It is well-settled that a district court does not err by giving a charge that tracks this Circuit's pattern jury instructions and that is a correct statement of the law.") (citing *United States v. Turner*, 960 F.2d 461, 464 (5th Cir. 1992)).

9

No. 15-20416

Case Agent was appropriately limited to the Agent's direct examination testimony; whether the exclusion of the plea colloquy of Shakbazyan was proper; and whether the exclusion of evidence gathered by a police officer in California from an unindicted co-conspirator was proper. We have reviewed Defendants' arguments and find no abuse of discretion in the evidentiary rulings by the district court.

Sentencing

Barson disputes two enhancements applied to his sentence. Juarez joins Barson in objecting to the first enhancement.

First, Defendants argue that the district court erred in concluding the 429 patients or Medicare beneficiaries for whom the conspirators falsely claimed benefits were "victims" under the guidelines.[15] We agree with the government that Application Note 4(E) of U.S.S.G. § 2B1.1 defines "victim" in a way that encompasses the Medicare beneficiaries because it includes "any individual whose means of identification was used unlawfully or without authority."[16] The district court did not err in applying this enhancement.

Second, Barson argues that the application of a sentencing enhancement for obstruction of justice under U.S.S.G. § 3C1.1[17] was inappropriate. During

---

[15] *See* U.S.S.G. § 2B1.1(b)(2)C) (2009).

[16] U.S.S.G. § 2B1.1 cmt. n.4(E). The Application Notes were amended in 2009 to include this additional definition of "victim." The amended Note reads, "For purposes of subsection (b)(2), in a case involving means of identification 'victim' means (i) any victim as defined in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority." *Id.* Application Note 1 defined victim as "(A) any person who sustained any part of the actual loss . . . ; or (B) any individual who sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1 cmt. n.1 (2008). Shakbazyan, who pleaded guilty on the first day of trial, challenged this application of the six-level sentencing enhancement under the *Ex Post Facto* Clause because the definition of "victim" was amended to include the unauthorized use of individuals' information. This same panel determined that Shakbazyan's argument was foreclosed by Fifth Circuit precedent and affirmed the district court's sentence. *United States v. Shakbazyan*, No. 15-20426, at 4-7, 9.

[17] The guideline states,

No. 15-20416

sentencing, the government argued that Barson's testimony was laden with falsehoods designed to mislead the jury including: Barson's claim that he trusted Shakbazyan so thoroughly he signed forms in blank on the day he met Shakbazyan and failed to ask for information about the Medicare application; Barson opened a bank account to receive reimbursements from Medicare, but did not know where the statements were being sent; and Barson failed to ask Juarez for his credentials or register the supervision of him with the Texas Medical Board. The district court who heard Barson's testimony agreed.[18] Our review of the record satisfies us that the district court, who observed Barson testify, did not abuse its discretion in finding that Barson's testimony lacked credibility and was untruthful in his testimony.

Prosecutorial Misconduct

Defendants allege that several statements made by prosecutors during trial amounted to prosecutorial misconduct. Some statements were objected to during trial and some objections are raised on appeal. We have reviewed these arguments and statements and find no error by the district court in permitting these arguments.

IV.

The district court committed no reversible error and we therefore affirm the Defendants' convictions and sentences.

---

If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

[18] The district court stated during sentencing, "Well, of course, I was here and listened to [Barson's] testimony. I agree with [the government] that much of it was not credible; and because he testified not credibly or untruthfully, that does–that is an obstruction of justice." **ROA.4374.**

11

No. 15-20416

JONES, Circuit Judge, concurring in part and dissenting in part:

Although I am pleased to concur in the bulk of this Medicare fraud appeal, I differ with the panel majority's interpretation of the term "victim" for sentencing enhancement purposes. The majority has embraced an unprecedented and grammatically inexplicable use of the term to, in effect, double count the loss attributable to this unsavory fraudulent patient care operation. The government has commendably stepped up its prosecution of flagrant Medicare and Medicaid frauds, but never have I seen this double counting of the "loss" to include not only the United States taxpayers who support Medicare payments but also the "patients," who paid not a dime, may not have even received treatment, and in a number of cases were co-conspirators paid to lend their names to the treatment center's fictitious files. Defendants have a right to be sentenced according to the plain meaning of the guidelines, not the government's here-concocted abuse of terms. I respectfully dissent.

The defendants here received a six-level sentencing enhancement upon the district court's finding that the 429 Medicare beneficiaries who visited defendants' fraudulent clinic were "victims" under the United States Sentencing Guidelines. (There was already an enhancement for the loss to the United States Treasury.) The majority's opinion tersely affirms the enhancement.[1] I would vacate the defendants' sentences and remand for

---

[1] The full treatment of the issue in the *per curiam* opinion is as follows: "Defendants argue that the district court erred in concluding the 429 patients or Medicare beneficiaries for whom the conspirators falsely claimed benefits were 'victims' under the guidelines. We agree with the government that Application Note 4(E) of U.S.S.G. § 2B1.1 defines 'victim' in a way that encompasses the Medicare beneficiaries because it includes 'any individual whose

resentencing because the Guidelines and relevant Commentary are inapplicable under both the plain meaning of the term "victims" and the purpose of its 2009 definition.

By way of background, "Victim" is not defined in the loss section of the Guidelines, § 2B1.1, but Note 1 (here inapplicable) and Note 4 of the Commentary define the term. Note 4(E) provides in relevant part:

> For purposes of subsection (b)(2), in a case involving means of identification "victim" means (i) any victim as defined in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority.[2]

The government argues that since the use of the 429 alleged beneficiaries' Medicare identification information was part of an unlawful conspiracy, the enhancement was proper. The defendants contend, however, that the beneficiaries were participants in the Clinic's kickback scheme rather than victims, and that the 2009 iteration of the Sentencing Guidelines was not intended to treat these beneficiaries as victims.

Guidelines Commentary "that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38, 113 S. Ct. 1913, 1915 (1993). "Application notes are given controlling weight so long as they are not plainly erroneous or inconsistent with the guidelines." *United States v. Rodriguez-Parra*, 581 F.3d

---

means of identification was used unlawfully or without authority.' The district court did not err in applying this enhancement." Proposed Opn. at 10.

[2] U.S.S.G. § 2B.1.1(b)(2)(C), Note 4(E) Cases Involving Means of Identification.

227, 229 n.3 (5th Cir. 2009) (*citing United States v. Urias-Escobar*, 281 F.3d 165, 167 (5th Cir. 2002).

In my view, the government's reading of the Guidelines is plainly erroneous for two reasons. First, that interpretation is inconsistent with the plain meaning of the term "victim." A victim is a "person who suffers from a destructive or injurious action or agency." "Victim," *The Random House Dictionary of the English Language (1966). See also* "Victim," *Merriam-Webster's Dictionary of the English Language*, http://www.merriam-webster.com/dictionary/victim, accessed Oct. 26, 2016 ("a person who has been attacked, injured, robbed, or killed by someone else"). The government, which bore the burden of proof for sentencing purposes, did not establish that any of the 429 purported patients were victims in this definitional sense. On the contrary, as the majority opinion states, "At trial, several of the clinic's patients testified they went to the clinic because they were paid to do so and some never received any medical services." Consequently, at least some of the 429 alleged beneficiaries could have been considered co-conspirators. Applying the application of the term "victims" here verges on the Orwellian.

Second, the majority's interpretation is inconsistent with the purpose of the Guideline's definition of victims. The Guidelines were updated as part of Amendment 726 to the *Identity Theft Enforcement and Restitution Act* of 2008.[3] The Sentencing Commission explained its reasoning for proposing the amendment that was adopted to create Application Note 4(E): to address more fully the actual harm done by identity theft.[4] Several circuits' interpretation

---

[3] U.S.S.G. App'x C, Vol. III, Am. 726, p. 308

[4] Office of General Counsel, *Victim Primer (§2B1.1(b)(2))I,* U.S. Sentencing Commission (2013), at 6.

14

of the pre-2009 Guidelines had broadened the definition of victims to those "individuals who suffered considerably more than a small out-of-pocket loss and were not immediately reimbursed by any third party," even if they were later reimbursed.[5]  Other circuit precedent held that victims were only those who suffered pecuniary loss from identity theft but were not reimbursed at all.[6] Amendment 726 was intended to resolve this circuit split.[7]  Under the 2009 Guidelines, while a victim of identity theft may be reimbursed by a third-party or bank, the Commission explained that "such an individual [victim], even if fully reimbursed, must often spend significant time resolving credit problems and related issues, and such lost time may not be adequately accounted for in the loss calculations under the guidelines."[8]  According to the Commission, this hassle and lost time justified considering as a victim for sentencing purposes anyone whose identity was stolen.  Therefore, the purpose for the definition of victims under Note 4(E) is to capture by an enhancement harms otherwise difficult to measure.  This purpose is entirely consistent with the plain meaning of "victim" in the English language.

This purpose is not fulfilled by applying the definition of victims in this case.  The government has not established that the 429 Medicare claimants had to spend "significant time," or any time at all, resolving credit or related

---

[5] *United States v. Lee*, 427 F.3d 881, 895 (11th Cir. 2005) (internal quotation marks omitted). *See also United States v. Stepanian*, 570 F.3d 51 (1st Cir. 2009); *United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008); *United States v. Panice*, 598 F.3d 426 (7th Cir. 2010); *United States v. Pham*, 545 F.3d 712 (9th Cir. 2008).

[6] *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005). *See also United States v. Kennedy*, 554 F.3d 415 (3d Cir. 2009); *United States v. Conner*, 537 F.3d 480 (5th Cir. 2008); and *United States v. Icaza*, 492 F.3d 967 (8th Cir. 2007).

[7] *Victim Primer (§2B1.1(b)(2))* at 8.

[8] USSG §2B1.1, comment. (n.4); USSG App. C, amend. 726 (eff. Nov. 1, 2009).

issues.  Even real Medicare beneficiaries are not normally victims of Medicare fraud because Medicare, not the patient, pays the billing provider directly.  The real victim is the U.S. taxpayer, through Medicare, and that has been accounted for by the guidelines in this case.  There is no proof at all that the purported beneficiaries in this case suffered any harm, pecuniary or otherwise; they cannot be considered victims under Note 4(E).

I respectfully dissent from this portion of the majority opinion.