# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-11121

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

NOBLE U. EZUKANMA,

Defendant–Appellant.

United States Court of Appeals
Fifth Circuit

**FILED**

November 28, 2018

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:15-CR-254-1

Before DENNIS, OWEN, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

Noble Ezukanma was indicted on one count of conspiracy to commit health care fraud and six counts of health care fraud for his role in a scheme to bill Medicare for home visits by a physician that failed to comply with Medicare regulations, were medically unnecessary, and overstated services rendered. A jury convicted Ezukanma on all seven counts, and the district court sentenced him to 200 months of imprisonment. Ezukanma appeals,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-11121

contending that the evidence was insufficient to support his convictions, the district court erred in failing to include Medicare regulations in the jury instructions, and the district court incorrectly calculated the loss amount. We affirm.

**I**

A third-party fraud investigator, Health Integrity, notified Medicare that US Physicians Home Visits (USPHV) "may have submitted claims for Medicare services not rendered." After further investigation, Dr. Noble Ezukanma was indicted along with Myrna Parcon and several others. All but Ezukanma pleaded guilty, and a superseding indictment was filed against him. The indictment alleged conspiracy to commit health care fraud (from January 2009 to June 2013) in violation of 18 U.S.C. §§ 1349 and 1347 (Count One), and six counts of health care fraud in violation of 18 U.S.C. §§ 1347 and 2 (Counts Two through Seven) for submissions of individual, fraudulent Medicare claims.

At the close of the Government's case-in-chief, Ezukanma moved for judgment of acquittal alleging insufficient evidence, and that motion was denied. The jury found Ezukanma guilty on all seven counts. The district court denied Ezukanma's renewed motion for judgment of acquittal.

At sentencing, the district court concluded that there was "rampant fraud in Mr. Ezukanma's operation" that was "sufficiently pervasive that the government's failure to interview every single witness and look at every single piece of paper is excused," and that Ezukanma presented "nothing to indicate he's entitled to a credit." The district court adopted the presentence report's (PSR) calculation that the actual loss to Medicare was $34,003,151.24, consisting of $27,745,523.32 for fraudulent home health certifications under Ezukanma's provider number and $6,257,627.92 in actual losses for physician home visits billed under Ezukanma's provider number and that of Ezukanma's organization, UNEC Group, Inc. (UNEC). The district court found that there

2

No. 17-11121

was an intended loss of $10,788,900 with regard to fraudulent billings. This resulted in a twenty-two level enhancement to the base offense level of six, as the loss was greater than $25,000,000 but less than $65,000,000. The offense level was increased by two levels because the offense involved ten or more victims, four levels because a federal health care offense with a loss of more than $20,000,000, and two levels for abusing a position of public trust. The district court granted a downward variance as to the criminal history category, resulting in a Guidelines range of 188 to 235 months of imprisonment. The district court sentenced Ezukanma to a term of 200 months of imprisonment and ordered him to pay restitution "in the amount of $34,003,151.24 jointly and severally with . . . Parcon" and others. Ezukanma appeals.

## II

Ezukanma alleges that there was insufficient evidence to convict him of conspiracy to commit health care fraud. To establish such a conspiracy, the Government must prove beyond a reasonable doubt "that (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose."[1] "The agreement may be silent and informal,"[2] and "may be inferred from concert of action."[3] "The Government may establish any element through circumstantial evidence," but "[p]roof of an agreement to enter a conspiracy is not to be lightly inferred."[4] Proving that "the defendant

---

[1] *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012) (citing 18 U.S.C. §§ 1347, 1349).

[2] *United States v. Barson*, 845 F.3d 159, 163 (5th Cir. 2016).

[3] *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009).

[4] *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) (alteration in original) (quoting *United States v. Johnson*, 439 F.2d 885, 888 (5th Cir. 1971)).

knew something criminal was afoot" is insufficient evidence of conspiracy,[5] as is piling "inference upon inference."[6] Also, "'[m]ere similarity of conduct among various persons and the fact that they have associated with or are related to each other' is insufficient to prove an agreement."[7]

When a defendant moves for acquittal in the district court, this court reviews challenges to the sufficiency of the evidence de novo.[8] "Appellate review is highly deferential to the jury's verdict,"[9] so the "jury's verdict will be affirmed unless no rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense beyond a reasonable doubt."[10] The jury may make factually based inferences,[11] but "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."[12] In this case, the Government presented sufficient evidence to sustain the conspiracy conviction.

## A

Ezukanma asserts that the evidence proves that Medicare was defrauded by USPHV, but not that he agreed to join a conspiracy with intent to defraud Medicare. Although no witness testified that Ezukanma knew he was in an agreement to commit Medicare fraud or knew his actions were

---

[5] *Id.* at 776.

[6] *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014).

[7] *Ganji*, 880 F.3d at 767-68 (quoting *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978)).

[8] *United States v. Danhach*, 815 F.3d 228, 235 (5th Cir. 2016).

[9] *Ganji*, 880 F.3d at 767.

[10] *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (quoting *United States v. Roetcisoender*, 792 F.3d 547, 550 (5th Cir. 2015)).

[11] *Ganji*, 880 F.3d at 767.

[12] *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996).

illegal, the Government presented substantial circumstantial evidence of Ezukanma's crimes.

Prior to his conviction, Ezukanma focused on pulmonary medicine and saw patients in clinical and hospital settings for eighteen years. At the time of his conviction, he had been operating Nobility Pulmonary and made rounds at five hospitals and a nursing home. During the latter ten years of his practice, Ezukanma also formed UNEC and provided home health care services to Medicare beneficiaries through that entity. Additionally, for several years, Ezukanma served as the medical director of another home health care organization, Healthcare Liaison Professionals, Inc. (HLP), doing business as USPHV, soon after its formation in December 2008.

Evidence at trial reflected that Medicare providers must submit an application to a Medicare Administrative Contractor and once approved, a provider is assigned a National Provider Identifier (NPI) number. Medicare billing claims must include the provider's identity and NPI number, a numeric code identifying the services rendered ("Current Procedural Terminology" or "CPT" code), and the amount requested for reimbursement. Patient files are not attached to these claims, but providers must maintain patient files and make them available to Medicare contractors upon request.

In relevant part, Medicare Part A covers inpatient, hospital and home health care services, and Part B covers outpatient services. Part B coverage includes home visits that would ordinarily take place in a physician's office, and patient records must explain why the visit took place at home, rather than the physician's office. For home health services under Part A, a physician must submit a "Form 485" certifying that the patient is confined to the home and has a specific need. Every sixty days, the physician must recertify the patient. The CPT codes for billing a home visit depend on the length and complication of the visit, and Medicare pays more for "prolonged" visits.

No. 17-11121

Specific codes correlate to specific durations of the visit.  There are differing codes, for example, for forty-minute and sixty-minute visits, and an additional code, in conjunction with the underlying CPT code, is used if there are additional services lasting from thirty to seventy-four minutes beyond the duration of the CPT code time frame.

Donna Large, an investigator at Health Integrity, testified that Ezukanma was the owner and medical director of USPHV, and stated that none of the claims data she reviewed justified a physician home visit.  Agent Michael Stapleton, a Medicare fraud investigator, explained USPHV's unconventional method of growing its client base.  Home health agencies typically receive referrals from the patient's treating physician,[13] but USPHV patients were generally referred by other home health agencies.

Agent Stapleton also addressed the scope of the alleged fraud. Ezukanma was the listed provider for 4,200 unique USPHV Medicare beneficiaries, 97.7% of whom received home health services.  Between January 2009 and July 2013, Medicare paid $27,745,523.32 for Part A home health services in which Ezukanma was the attending physician, about $4 million of which was paid to Parcon's other home health agencies.  Over a similar period, UNEC and HLP billed $10,788,900 and Medicare paid $6,257,621.92 for Part B home medical visits, certifications of home health, and the oversight of care plans all allegedly performed by Ezukanma.  Almost all home visits for new patients, 99.7%, were billed at the highest CPT codes, usually reserved for "an extremely complex examination that typically takes 75 minutes."  Ezukanma was the listed as the provider for 25,337 home visits, and approximately 98% were billed under CPT codes for prolonged services reserved for complex

---

[13] *See Ganji*, 880 F.3d at 764 ("Usually, although not a legal requirement, a patient's primary care physician . . . refers her for home health services.").

examinations.  Records indicate that Medicare was often billed for more than twenty-four hours of work in a day under Ezukanma's NPI number, including a 211 hour day in October 2012.  On some days, Ezukanma billed significantly more hours than his visitation schedule indicated, such as one day when Ezukanma billed Medicare 11.3 hours for five hours of home visits.  The government also presented evidence that over a five-day period, USPHV billed Medicare for 426 unique medical services under Ezukanma's billing number while he was in Germany.

The Government also presented evidence that home visits were medically unnecessary.  Richard Schutt, a physician's assistant, and Gabriella Udabor, a nurse practitioner, both testified that they performed in-home visits for USPHV that were often not medically necessary.  Dr. Ransome Etindi testified that some of the patients he visited at their homes did not necessarily meet the criteria for such visits.  He also admitted that he would sign Form 485 certifications without reviewing medical records or determining if the patients were actually homebound.  Denson Burkhead, a former FBI agent who worked at Health Integrity, interviewed approximately a dozen patients, and testified that some "had no need for home visits and that they did not receive any positive benefit from the home visits."

The Government presented evidence that Ezukanma was a co-signer on HLP and UNEC bank accounts.  The USPHV "Start-Up Organizational Agreement" stated that the company would "[u]tiliz[e] [Ezukanma's] provider number," and that Ezukanma would be paid $50 per patient home visit, as well as a share of company's profits.  Ezukanma did not sign the agreement. However, from January 2009 through November 2011, USPHV billed Medicare under Ezukanma's and UNEC's provider numbers.  In March 2010, when USPHV applied for its own Medicare provider number, Ezukanma signed the application and was listed as "Owner/Director."

No. 17-11121

Burkhead testified that in mid-2011, Ezukanma admitted to him that he knew UNEC and USPHV were submitting claims under his NPI number for visits performed by others.   In this interview, Ezukanma also admitted that his home visits were usually thirty to forty-five minutes, which would not qualify as "prolonged" visits.   Ezukanma kept extensive UNEC billing paperwork at his house.   From March 2009 to May 2013, USPHV and HLP paid Ezukanma $354,452.88.   USPHV also paid Ezukanma at least $5,000 cash, made his car payments, and wired funds to Nigeria, Ezukanma's place of birth.   Cash, in the amount of $344,000, was found at Ezukanma's house.

Loretta Bourland, Ezukanma's assistant at his Nobility Pulmonary practice, testified that USPHV would send twenty to thirty faxes a day with paperwork for Ezukanma to sign.   Ezukanma would often sign these documents without reading them and fax them back.   Evidence presented at trial indicates these documents included Form 485 certifications.   Bourland also stated that "[t]here's no way" Ezukanma made all the home visits because he was usually at his primary pulmonary practice.

The Government also presented a large number of blank Form 485 certifications found in Parcon's office, pre-signed with Ezukanma's signature. There is evidence of discrepancies between signatures purporting to be those of Ezukanma on some of these forms.   Glenda Lydia testified that she witnessed Ezukanma give Parcon his Medicare provider number and other personal information so that USPHV could start billing Medicare prior to receiving its own provider number.   She also testified that Ezukanma was present at USPHV lunch meetings in which Parcon told staff to "use the highest extent of the [billing] code for a new patient visit."   Ezukanma's NPI number was pre-populated on bills from Parcon's office.

8

No. 17-11121

Ezukanma does not allege this evidence was inadmissible. Instead, he contends it is insufficient to prove intent. We disagree. The evidence presented by the government was sufficient for the jury to infer intent.

## B

Ezukanma asserts that there is insufficient evidence that he knew of the overbilling. Ezukanma told investigators he did not know how billing for home visits worked, and it appears that Parcon and other employees were responsible for billing Medicare. However, defendants "need not have personally submitted the necessary forms requesting reimbursement from Medicare to be guilty of health care fraud or conspiracy to commit health care fraud."[14] The jury could have credited the unsigned start-up document, the testimony that Ezukanma attended meetings in which employees were instructed to overbill, the UNEC remittance notices at Ezukanma's home, Ezukanma's 18 years of experience, the testimony that he admitted knowledge of UNEC and USPHV submitting claims under his NPI for visits performed by others, and that he signed certifications without reading them, to infer that even though billing was not Ezukanma's responsibility, he knowingly and willingly agreed to defraud Medicare.

## C

Ezukanma challenges the sufficiency of the evidence supporting the finding that he fraudulently certified Medicare beneficiaries for home health services. He argues that he was not required to be present for the home health care visits and that a face-to-face encounter was not required for his NPI number to be used for visits performed by others.

---

[14] *United States v. Barson*, 845 F.3d 159, 164 (5th Cir. 2016); *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014).

No. 17-11121

For Part A claims, Ezukanma could bill for home health certifications performed by others.  Under 42 C.F.R. § 424.22(a)(1)(v), to certify someone for home health services, a face-to-face encounter may be conducted by the certifying physician or enumerated others, including a nurse practitioner "in collaboration with" the certifying physician or a physician assistant "under the supervision of the certifying physician."[15]  This regulation came into effect in 2011—after the conspiracy began—but despite conflicting testimony, there was also likely no requirement from 2005 to 2011 that the physician be present for home health certifications performed by others.  On the other hand, for Part B claims for home visits, Ezukanma likely could only bill for visits he personally made, according to testimony that under the Medicare Claims Processing Manual, "a home visit cannot be billed by a physician unless the physician was actually present in the beneficiary's home."  The evidence is sufficient to show fraud regardless of Ezukanma's presence in the homes of beneficiaries.

At trial, witnesses testified that patient encounters must be face-to-face, and the indictment stated that home health care may only be ordered by a physician who had "face-to-face contact treating the beneficiary."  But even assuming that Ezukanma need not meet a Medicare beneficiary to certify her as homebound, the jury could have relied on other evidence to find that Ezukanma fraudulently certified his patients.  Schutt testified that Ezukanma was his supervising physician, but that Schutt did not meet Ezukanma for at least six weeks after Schutt began making home visits for USPHV, never accompanied Schutt on visits, and did not ask about any notes.  Udabor testified that Ezukanma was her supervising physician but that they only spoke about patient care "maybe one or two times" in her six-month tenure,

---

[15] 42 C.F.R. § 424.22(a)(1)(v); *see also Ganji*, 880 F.3d at 771.

and that Ezukanma never accompanied her on visits.  Burkhead testified that Ezukanma told him he would supervise other practitioners.  Based on Schutt's and Ubador's testimony, a jury could conclude that Ezukanma failed to comply with certification regulations because he did not supervise or collaborate with those certifying patients under his NPI number.[16]

Even if Ezukanma did not know that his failure to supervise was illegal, there is other evidence of his intent to certify patients fraudulently, such as the blank Form 485 certifications with his signature, and the testimony that he likely signed these forms without reading them.  Ezukanma claims there was no proof the signatures were his and that they could be forged.  Perhaps, but a rational jury could also infer that Ezukanma signed these forms to defraud Medicare.

Relatedly, Ezukanma highlights a December 2012 cease-and-desist letter to Parcon stating "[i]t has come to my attention that my [NPI Number is] being used to bill for medical services rendered by other physicians," and to cease and desist immediately.  In *United States v. Umawa Oke Imo*, the defendant sent a similar letter but the guilty verdict was affirmed because of the other evidence of fraud.[17]  Likewise, there is substantial evidence that Ezukanma knew his NPI number was used by others well before December 2012, and Ezukanma had spoken with fraud investigators seventeen months prior.  A rational jury could place little weight on this letter.  Therefore, the evidence was sufficient for the jury to convict Ezukanma for fraudulently certifying Medicare beneficiaries for home health services.

---

[16] 42 C.F.R. § 424.22.
[17] 739 F.3d at 236-37.

No. 17-11121

## D

Finally, Ezukanma likens his case to *United States v. Ganji*, in which this court held that there was insufficient evidence to prove a physician agreed to defraud Medicare.[18]  There are factual similarities between Dr. Ganji and Dr. Ezukanma's cases: both were hired by home health agencies as medical directors, the agencies committed Medicare fraud, and both physicians allege there was insufficient evidence to prove their role in the conspiracies beyond a reasonable doubt.[19]  Also, both cases had evidence of blank, signed certification forms.[20]  But unlike Ezukanma, who did not testify and argued the signatures could be forgeries, Ganji testified that these blank forms were preceded by medical records she reviewed before signing the forms.[21]  In *Ganji*, there "was no evidence that Dr. Ganji" would refer patients who were not homebound to the home health agency,[22] and the prosecution proved only that: (1) another physician defrauded Medicare, (2) Ganji was compensated, and (3) Ganji increased patient referrals to the fraudulent home health agency.[23]  In this case, the Government presented similar evidence—(1) Dr. Etindi's admission of fraud, (2) evidence of $350,000 in compensation, and (3) thousands of referrals by Ezukanma to home health agencies (many multiples more than Ganji, none of whom were already primary care patients of Dr. Ezukanma)[24]—but also much more, including evidence that Ezukanma would refer patients who were not homebound to home health agencies.

---

[18] *Ganji*, 880 F.3d at 773.
[19] *Id.* at 764-67.
[20] *Id.* at 772.
[21] *Id.*
[22] *Id.* at 771.
[23] *Id.*
[24] *Id.* at 772-73.

No. 17-11121

On appeal of the sufficiency of the evidence, this court has affirmed a conviction for conspiracy to commit health care fraud when the defendant knew billing codes were being altered, he co-signed the bank account and was held out as an owner of the fraudulent organization, he signed the Medicare provider application, he was informed of the likely fraud, and he was aware of the high profits margins received on upcoded items.[25]  There was also sufficient evidence to convict a physician who knew her NPI number was being used to bill for services she was not licensed to provide, received compensation, and signed Medicare application documents.[26]  In *United States v. Barson*, despite a lack of experience with the Medicare billing process, we affirmed a conspiracy conviction.  The evidence showed that the defendant signed blank documents, allowed the clinic to bill others under his NPI number, opened a bank account that received Medicare reimbursements, and was compensated.[27]  Barson also admitted to an FBI investigator that several suspicious circumstances had come to his attention, but he did not report his concerns to anyone.[28]

The copious evidence against Ezukanma—from his awareness others were billing under his NPI number to his presence at meetings discussing overbilling to his approval of up to 211 hours of patient visits per day—when viewed in the light most favorable to the prosecution, demonstrates that a rational jury could infer that the Government proved the essential elements of conspiracy to commit health care fraud beyond a reasonable doubt.

## III

Ezukanma argues that there was insufficient evidence to convict him of health care fraud.  To convict for health care fraud, the Government must

---

[25] *United States v. Willett*, 751 F.3d 335, 340-43 (5th Cir. 2014).

[26] *United States v. Umawa Oke Imo*, 739 F.3d 226, 236-37 (5th Cir. 2014).

[27] *United States v. Barson*, 845 F.3d 159, 164-65 (5th Cir. 2016).

[28] *Id.* at 163-64.

prove beyond a reasonable doubt that Ezukanma (1) "knowingly and willfully execute[d], or attempt[ed] to execute, a scheme" to either "defraud any health care benefit program" or "obtain, by means of false of fraudulent pretenses, representations, or promises, any of the money or property owned by . . . any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services;"[29] (2) acted with specific intent to defraud Medicare, (3) made material false or fraudulent representations; and that (4) the operation of the health care benefit program affected interstate commerce.  Because Ezukanma moved for acquittal in the district court, we again review this challenge to the sufficiency of the evidence de novo.[30]

Ezukanma again contends that the there was insufficient evidence to prove he knowingly executed a scheme with the intent to defraud Medicare and that the evidence does not prove he knew these patients were fraudulently certified as homebound.  In support, he again cites *Ganji*, in which this court overturned Dr. Ganji's fraud conviction because there was insufficient proof that "the accused doctor executed a fraudulent scheme with knowledge that the patient was not homebound."[31]  While evidence of Dr. Ganji's "lax practices" and "haphazard" business operation permitted an inference that the patient was not homebound, the jury could not "stretch that into a second inference that Dr. Ganji *knew* [the patient] was not homebound."[32]

In this case, the Government presented evidence that each patient was certified as homebound by a physician's assistant or nurse practitioner, Ezukanma was listed as the performing physician on the Medicare claim even though he was not present, Medicare paid for the visit, the patient did not

---

[29] 18 U.S.C. § 1347.

[30] *United States v. Danhach,* 815 F.3d 228, 235 (5th Cir. 2016).

[31] *United States v. Ganji,* 880 F.3d 760, 777 (5th Cir. 2018).

[32] *Id.* at 777-78.

qualify for home health services, and USPHV billed for "prolonged" visits even though most, if not all, of the patients were seen in less time.  Using Count Two as an example, in April 2012, Schutt visited Medicare beneficiary Geneiva Sewell at her home for less than thirty minutes.  There was no evidence Sewell was homebound, and the patient voiced no medical concerns, yet Schutt authorized home health services.  Medicare was billed for a ninety-minute visit with Ezukanma listed as the provider.  The claim was paid into a USPHV account that Ezukanma could access.  Based on the patient files, the other five claims that form the basis of Counts Three through Seven appear similarly medically unnecessary.

Although there is no direct evidence that Ezukanma knew the individual patients were being fraudulently certified as homebound, and Ezukanma repeats that he was not part of Parcon's fraudulent billing and certification scheme, a "defendant need not have actually submitted the fraudulent documentation . . . in order to be guilty of health care fraud."[33]  A defendant is punishable as a principal if he aids, abets, or induces the commission of the fraud.[34]  In *Imo*, the health care fraud convictions against the defendant were affirmed based on the evidence of conspiracy.[35]  In this case, the evidence was sufficient for a rational jury to convict Ezukanma of conspiracy, and a rational jury could also find that the Government proved beyond a reasonable doubt that Ezukanma knew USPHV was fraudulently certifying these patients as homebound—under his NPI number and for prolonged visits—in order to defraud Medicare.  Accordingly, we affirm Ezukanma's convictions for health care fraud.

---

[33] *United States v. Willett*, 751 F.3d 335, 340 (5th Cir. 2014) (quoting *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014)).

[34] 18 U.S.C. § 2.

[35] *Imo*, 739 F.3d at 237; *see also Willett*, 751 F.3d at 340-43 (analyzing the sufficiency of the evidence as to conspiracy and substantive health care fraud together).

No. 17-11121

## IV

Alternatively, Ezukanma asks that this court reverse and remand, alleging that the district court plainly erred by not including relevant Medicare regulations in the jury instructions. Ezukanma admits that neither party requested a jury instruction on Medicare regulations. Accordingly, this unpreserved challenge to the jury instructions is reviewed for plain error.[36] To establish plain error, the defendant must show that "(1) there was error; (2) the error was clear and obvious, not subject to reasonable dispute; (3) the error affected his substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."[37] In reviewing jury instructions, this Court considers "whether the instruction, taken as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them."[38] Plain error only occurs if "the instruction, considered as a whole, was so clearly erroneous as to result in the likelihood of a grave miscarriage of justice."[39]

The jury instructions included the essential elements of each crime, but made no mention of Medicare regulations. Ezukanma does not challenge the instructions given; he challenges the omission of instructions about Medicare regulations, claiming that they were needed to explain the law properly. Medicare requirements were relevant to whether Ezukanma agreed to defraud Medicare,[40] and he argues that the testimony at trial about Medicare was

---

[36] *United States v. Nagin*, 810 F.3d 348, 350 (5th Cir. 2016).

[37] *Id.* (citing *Puckett v. United States*, 556 U.S. 129, 135 (2009)); *see also Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904-07 (2018).

[38] *United States v. Ebron*, 683 F.3d 105, 151-52 (5th Cir. 2012).

[39] *United States v. Davis*, 19 F.3d 166, 169 (5th Cir. 1994).

[40] *See United States v. Saks*, 964 F.2d 1514, 1523 (5th Cir. 1992) (explaining that it was not plain error to omit a cautionary instruction about a civil regulation discussed at trial, because "[t]he government would be hard pressed to prove that defendants defrauded federal regulators without mention of the regulations these officials are responsible for enforcing").

No. 17-11121

"confusing, inconsistent and in apparent conflict with the law." Although the testimony at trial likely misstated that Medicare required Ezukanma to have met all his patients face-to-face,[41] Ezukanma rebutted this testimony during cross-examination and in his closing argument. Regardless, Ezukanma likely violated Medicare regulations by inadequately supervising those who performed in-home visits.[42] Donna Large referenced the Medicare Claims Processing Manual without explaining it was not the law. Medicare manuals do not have the force of law,[43] but they do assist the jury in understanding how claims are processed. Ezukanma did not challenge the manual's admissibility.

Ezukanma argues that based on these misleading statements, and in the absence of a jury instruction on Medicare regulations, the jury could not determine if the Government proved its fraud theory beyond a reasonable doubt. But even assuming the testimony was flawed, there is sufficient evidence of guilt. Ezukanma has not shown plain error simply because the judge failed to *sua sponte* include Medicare regulations in the jury instructions. He certainly has not shown that the omission was a clear and obvious error, affected his substantial rights, *and* seriously affected the fairness, integrity, or public reputation of the judicial proceedings.[44]

V

Even if his conviction is affirmed, Ezukanma asks this court to remand for resentencing, primarily because the district court allegedly erred by shifting the burden of proof for the loss calculation upon a finding that the

---

[41] *Cf. United States v. Ganji*, 880 F.3d 760, 764 (5th Cir. 2018) ("Regulations allow for medical professionals who are not physicians to complete the face-to-face encounter."); 42 C.F.R. § 424.22(a)(1)(v).

[42] 42 C.F.R. § 424.22(a)(1)(v) (stating that a face-to-face encounter must be performed by the certifying physician or other qualified non-physicians working "in collaboration with" or "under the supervision of" the certifying physician).

[43] *See United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 379 (5th Cir. 2017).

[44] *See United States v. Nagin*, 810 F.3d 348, 350 (5th Cir. 2016).

fraud was pervasive. Generally, the Government has the "burden of demonstrating the amount of the loss sustained by a victim as a result of the offense."[45] There must be "some factual basis for the conclusion that those losses were the result of fraud."[46] But "where the government has shown that the fraud was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate," otherwise all claims are included in the loss calculation.[47]

The issue on appeal is whether the district court properly concluded that the loss calculation was reasonable.[48] Generally, this court reviews the application and interpretation of the Sentencing Guidelines de novo, and reviews factual findings for clear error.[49] Estimating loss is a "factual finding reviewed for clear error," while "the court's *method* of calculating those losses is an application of the guidelines subject to de novo review."[50] "[T]his court need only determine whether the district court made 'a reasonable estimate of the loss.'"[51] As to the finding that fraud was pervasive, this court has not expressly opined as to the appropriate standard of review, however in this case the result is the same under either a de novo or clear error standard.

---

[45] 18 U.S.C. § 3664(e); *see also United States v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998).

[46] *United States v. Hearns*, 845 F.3d 641, 649 (5th Cir. 2017) (citations omitted); *see also United States v. Hebron*, 684 F.3d 554, 561 (5th Cir. 2012) ("[L]oss calculations in government-benefit cases include only fraudulent ones and not payments to which the [defendant] was legitimately entitled.").

[47] *Hebron*, 684 F.3d at 563.

[48] *Id.* at 560 (citing U.S.S.G. § 2B1.1 cmt. 3(C)).

[49] *See United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011).

[50] *United States v. Fairley*, 880 F.3d 198, 215 (5th Cir. 2018).

[51] *Id.* (quoting *Hebron*, 684 F.3d at 560).

No. 17-11121

## A

The base offense level for a fraud conviction is six but can increase based on the amount of loss.[52]  Ezukanma claims that the loss should have been $10,000, which would result in a guidelines range as low as six to twelve months.  Over Ezukanma's objections, the district court adopted the PSR calculation that the actual loss was $34,003,151.24,[53] and after granting a downward variance from the 235 to 293 month guidelines range, sentenced Ezukanma to a total term of 200 months' imprisonment—within the revised 188 to 235 month guidelines range.  The main reason for this  increase in the guidelines ranges was the 22-level enhancement for a loss calculation greater than $25 million but less than $65 million.[54]   The district court's loss calculation was correct because the fraud was "so extensive and pervasive that separating legitimate benefits from fraudulent ones [was] not reasonably practicable."[55]

The district court found "by a preponderance of the evidence that the relevant conduct . . . established by the evidence, by the government's proof, by the PSR, by the evidence at trial, and hav[ing] carefully listened to the defense arguments" amounted to fraud "sufficiently pervasive that the government's failure to interview every single witness and look at every single piece of paper is excused."  Ezukanma asserts that while calculating the true loss would be difficult, it was "reasonably practicable" for the Government to establish which transactions were fraudulent, but it "did not want to" do the work.  The district court did express reservations about the Government's assertions that every claim for every patient was fraudulent.  While the district court acknowledged

---

[52] U.S.S.G. § 2B1.1(a)(2), (b)(1) (2016).
[53] The district court may properly calculate the loss by using actual loss or intended loss.  U.S.S.G. § 2B1.1 cmt. 3(A) (2016).
[54] *See* U.S.S.G. § 2B1.1(b)(1) (2016).
[55] *Hebron*, 684 F.3d at 563.

that "obviously there was rampant fraud in Mr. Ezukanma's operation," it noted that this "is a case where we don't know that every single dollar that he generated in Medicare claims was based on fraud."

Ultimately, the district court concluded that the Government produced sufficient evidence of the scope of the fraud to find the fraud pervasive. The Government reviewed over 1,000 files and interviewed multiple beneficiaries. Evidence at sentencing, testimony from Stapleton and Bourland, and the "master list" indicate that Ezukanma did not personally conduct most in-home visits, and there is evidence he knew of over-billing and improperly certified patients for home health services. Ezukanma challenges much of this evidence as insufficient or mischaracterized for the same reasons he challenged his conviction, but even if some of his concerns have merit, all of the fraudulent claims were likely a "reasonably foreseeable" result of joining the conspiracy.[56] Additionally, much of this evidence was in the PSR, which is generally considered reliable for sentencing purposes, so long as it is not based on "bare assertions,"[57] and has "sufficient indicia of reliability to support its probable accuracy."[58] Furthermore, at the sentencing hearing, Agent Stapleton testified that although he had not reviewed all the records, based on those he had reviewed, the procedures established, and the interviews conducted, there was,

> an overall pattern of services not being provided, of services that were not needed and that, based on the backwards referral process, based on the false certifications which deprived Medicare of any opportunity to truly vet whether the services were needed, that . . . all of the subsequent money paid for home health services was tainted.

---

[56] *See* U.S.S.G. § 1B1.3(a)(B)(iii) (2016) (adjustments at sentencing take into account "all acts . . . reasonably foreseeable in connection with that criminal activity").

[57] *United States v. Hearns*, 845 F.3d 641, 650-51 (5th Cir. 2017).

[58] *Id.*; *see also* U.S.S.G. § 6A1.3 (2016).

No. 17-11121

It is not "reasonably practicable" to make an individual determination of the validity of the claims, as it would be inefficient, expensive, and problematic to ask the Government to review over 90,000 claims and interview 4,200 Medicare beneficiaries to establish a loss calculation. As this court has explained, the wrongdoer "should not reap the benefits of a lower sentence because of his ability to defraud the government to such an extent that an accurate loss calculation is not possible."[59]

In an unpublished decision, this court has held that when the trial evidence demonstrated that "the vast majority of patients . . . did not need home healthcare services and received 'little or no benefit' from these services," the fraud was pervasive.[60] Accordingly, the district court did not err in holding that the evidence demonstrates that the fraud was "sufficiently pervasive that the government's failure to interview every single witness and look at every single piece of paper is excused." This shifted the burden to Ezukanma to show that certain claims were legitimate.

**B**

Ezukanma also asserts that he should have received credit for the fair market value of services rendered. The district court correctly held that Ezukanma did not meet his burden of demonstrating certain legitimate claims and presented "nothing to indicate he's entitled to a credit." If Medicare beneficiaries "receive legitimate health care services for which Medicare would pay but for a fraud," the fair market value should be deducted from the loss calculation.[61] However, the defendant has the burden of proving that he

---

[59] *Hebron*, 684 F.3d at 563.

[60] *United States v. Murthil*, 679 F. App'x 343, 352 (5th Cir. 2017) (per curiam) (unpublished).

[61] *United States v. Mahmood*, 820 F.3d 177, 193 (5th Cir. 2016); *see also United States v. Klein*, 543 F.3d 206, 214 (5th Cir. 2008) (offsetting the loss amount with the value of the medication provided).

No. 17-11121

rendered legitimate services that Medicare, as victim of the fraud, would have paid for but for the fraudulent billing.[62]  Ezukanma provided no such evidence at sentencing.

## C

Finally, Ezukanma alleges that the intended loss calculation was erroneous because there was no inquiry into his actual intent.  "In *United States v. Isiwele*, we 'endorsed a fact-specific, case-by-case inquiry into the defendant's intent in determining intended loss for sentencing purposes' in the health care fraud context."[63]  While it is possible that Ezukanma did not know, foresee, or intend to defraud Medicare every time he signed a form or a fraudulent claim was filed, the Sentencing Guidelines state that he must take responsibility for all acts that are "reasonably foreseeable in connection with that criminal activity."[64]  Furthermore, "[t]he amount billed to Medicare and Medicaid is 'prima facie evidence of the amount of loss [the defendant] intended to cause,'" albeit not "conclusive evidence."[65]  And there was other evidence that Ezukanma intended to defraud Medicare.  But even if Ezukanma lacked subjective intent, actual losses were $34,003,145.24.  This is equivalent to the restitution order and results in the same 22-level enhancement as the $38 million intended-loss calculation.[66]

There was sufficient evidence to determine that the fraud was pervasive.  Accordingly, the loss calculation was reasonable and is affirmed.

\*     \*     \*

For the foregoing reasons, we AFFIRM the district court's judgment.

---

[62] *Id.* at 194.

[63] *United States v. Umawa Oke Imo*, 739 F.3d 226, 240 (5th Cir. 2014) (quoting *United States v. Isiwele*, 635 F.3d 196, 203 (5th Cir. 2011)).

[64] U.S.S.G. § 1B1.3(a)(B)(iii) (2016).

[65] *Imo*, 739 F.3d at 240 (quoting *Isiwele*, 635 F.3d at 203).

[66] U.S.S.G. § 2B1.1(b)(1) (2016).